RAUL RAMON GONZALEZ and MARIA A. GONZALEZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gonzalez v. Commissioner
Docket No. 5790-73.
United States Tax Court
T.C. Memo 1977-240; 1977 Tax Ct. Memo LEXIS 198; 36 T.C.M. (CCH) 982; T.C.M. (RIA) 770240; July 27, 1977, Filed *198 The Treasury Department established a program of conducting tax investigations of those persons suspected of being in the narcotics business, and because of an informer's report that P was engaged in such business and because he associated with other persons suspected of being in such business, he became the subject of a tax investigation. The investigation produced no evidence that P was engaged in the narcotics business, but he was indicted for tax evasion. P's income was computed by an analysis of his bank deposits and cash expenditures. Throughout the investigation, P claimed that he had brought a large cash hoard with him from Cuba but exercised his. Fifth Amendment rights and declined to furnish information to support its existence. After the Government presented its case in the criminal trial, the court granted P's motion for a judgment of acquittal. Held: (1) P's judgment of acquittal in the criminal case does not collaterally estop the Commissioner from litigating, in this case, the question of P's civil tax deficiencies; (2) the circumstances of the investigation of P do not justify invalidating the notice of deficiency, nor shifting the burden of proof; and (3) *199 P's omitted income and additional deductions determined. Sky E. Smith, for the petitioners. Steedly Young, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: [1] Sec. 6653(b) Year
Deficiency
Addition to Tax
1968
$5,367.46
$2,683.73
1969
3,162.96
1,581.48
1970
4,133.35
2,066.67
The Commissioner now concedes the additions *200 to the tax; thus, the only issues remaining for decision are: (1) Whether the Commissioner is barred by the doctrine of collateral estoppel from litigating, in this case, the question of the petitioner's civil deficiencies; (2) whether the Government's conduct during the tax investigation should cause us to nullify the notice of deficiency or to shift the burden of proof to the Commissioner; (3) whether the 6-year statute of limitations contained in section 6501(e) is applicable to 1968; and (4) whether the petitioners understated their income during the years in issue. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Raul Ramon Gonzalez and Maria A. Gonzalez, were husband and wife during the years in issue, and they resided in Miami Beach, Fla., when they timely filed their petition herein. They filed joint Federal income tax returns for 1968, 1969, and 1970 with the Internal Revenue Service Center, Chamblee, Ga. Their 1968 return was filed on May 6, 1969; their 1969 return was filed on May 20, 1970; and their 1970 return was filed on or before April 15, 1971. Mr. Gonzalez will sometimes be referred to as the petitioner. *201 In late October 1960, the petitioners fled their native Cuba with their two children because they did not want to live under a communist government headed by Fidel Castro. They sought asylum in this country and were granted entry as political refugees. In Cuba, the petitioner was very prosperous and well known. He was the general manager and a 7-1/2 percent owner of the Havana Hilton Casino. His ownership interest was worth approximately $75,000, and he received for his management of the casino a salary of $350 a week, a hotel suite, and an allowance for personal expenses. In addition, he owned a bar and restaurant called the Twenty-One Club, from which he received yearly approximately $60,000 in profits and a salary of $7,200. He also owned a 10-percent interest in the Comodoro Yacht Club and Casino in Havana, numerous homes, a farm, a 37-1/2-foot yacht, a 20-foot launch, and substantial amounts of other assets, including bank deposits which exceeded $150,000. The petitioner had additional income from his gambling activities, and he knew many gamblers. After Fidel Castro came to power in January 1959, the petitioner had almost daily contact with him because Mr. Castro *202 lived in the Hilton Hotel on the same floor as the petitioner. The petitioner had been acquainted with Mr. Castro since their school days. Although the petitioner at first admired Mr. Castro, the petitioner, after several conversations with him, became very disappointed with him and believed that Cuba was going to change for the worse. Various events solidified the petitioner's fears: within days after Mr. Castro assumed power, $500,000 worth of the Hilton's funds were frozen, and only after a great deal of effort was the petitioner able to obtain a part of such funds. In addition, on June 21, 1960, the Castro government was named "intervenor" in the Havana Hilton and took over all of the casino's assets. At that time, the petitioner started formulating definite plans for leaving Cuba and for taking with him as much money as possible. Upon the outbreak of the revolution in December 1958, the petitioner had managed to send $35,000 in American currency out of the country with a friend of his who was a multimillionaire in Cuba and a substantial stockholder in the Havana Hilton. The petitioner planned to make his escape by use of his yacht the "Wahoo" and his smaller boat the *203 "Diana-Li." In order to allow him to take as much money as he could with him, he had a carpenter make a large formica-covered ice chest. In the section of the ice chest where ordinarily the insulation would be placed, the petitioner had the carpenter leave empty spaces so that money could be stored therein. Although the petitioner was unable to sell many of his assets, he was able to obtain some of his funds in bank accounts, as well as the cash he had stored in various vaults located in the Hilton, his private club, his house, and at two banks. The petitioner estimated that he stuffed approximately $325,000 into the insulation spaces of the ice chest. According to his best guess, he had 10 or 15 thousand dollar bills, more than that in five hundred dollar bills, and the rest of the cash was in hundred dollar bills. On October 28, 1960, the petitioner's wife and two children fled Cuba in accordance with arrangements made by the petitioner. He wanted his family to depart before he did to be sure that they were on their way to safety before he left the country. Thereafter, at about 6:00 p.m. on October 29, 1960, the petitioner, accompanied by others, left Cuba in his two boats. *204 On board with the petitioner was Rufo Antonio Lopez Fresquet, formerly the Cuban Secretary of the Treasury and the highest ranking Cuban official to have fled as of that date. When the boats left Cuba, the petitioner stayed in the smaller boat, wherein the ice chest and his money were located. He had a captain navigate the yacht. When the boats were only 2 or 3 hours away from the Cuban shore, the smaller boat developed motor trouble, and it carried insufficient gasoline to make the entire trip. The captain of the yacht hopped into the smaller boat, the petitioner jumped into the yacht, and a rope was used to secure the disabled vessel to the larger one, which towed it. Because of the proximity of the breakdown to the Cuban coast, Mr. Fresquet became very nervous and wanted the petitioner to abandon the smaller boat so that the yacht would not be slowed down by the towing. In the middle of the ocean, Mr. Fresquet offered to buy the boat from the petitioner for $500, $800, and then $1,000. However, the petitioner refused, saying that part of his money was in the small boat, and he was not going to give it up. Finally, they arrived in Key West, Fla. The petitioner told the immigration *205 officer that he had only $200 in his pockets. In November 1960, the petitioner was visited by the friend who had taken his $35,000 out of Cuba; during that visit, the money was returned to the petitioner in cash. The petitioner placed such funds in a vault at the Carner Bank in Miami Beach, Fla. In addition, he initially deposited $12,000 to $15,000 of the cash hoard brought from Cuba in a checking account at the Carner Bank, and he placed a portion of the hoard in a safe deposit box at that bank. He kept the rest of the hoard in his home in a black piece of luggage; sometimes he carried it on his person. The petitioner engaged in his first financial venture in this country shortly after he arrived. He, along with another individual, operated a night club called Club Taboo in the Versailles Hotel in Miami Beach. However, the venture proved unsuccessful, and within a matter of weeks, the petitioner lost approximately $8,000. Within two and one-half months after the petitioner entered the United States, he left for Guatemala to train for an invasion of Cuba. He took part in the Bay of Pigs invasion and was captured and imprisoned until December 24, 1962. His return to this *206 country was paid for by others in the United States. During the period the petitioner was absent from the United States, his family's needs were met by funds from his cash hoard. Other funds were generated by the disposition of the petitioner's two boats: The smaller one was sold by the petitioner for $3,750 before he left for the training in Guatemala. The yacht, which cost the petitioner $40,000, was involved in an accident while he was away, and his wife recovered only $4,200 in insurance proceeds. The record is barren as to the petitioner's financial affairs subsequent to his return to this country after his imprisonment in Cuba and prior to 1966: his employment, if any, during that period is unspecified, and the extent to which he and his family had to use his cash hoard is also not of record. However, the record does indicate that in 1965 or 1966, the petitioner may have deposited $40,000 or $50,000 of the cash hoard in his checking account. In 1966, the petitioner and two other individuals formed a corporation, A-1 Stationers, Inc. He put up $2,000 for the venture, which he borrowed from the Carner Bank. One of the conditions upon which the petitioner entered into *207 such venture was that the business would make the payments on his loan to the Carner Bank. The salary the petitioner received from the business was very small, and in 1967, he decided to leave the stationery business in order to earn more money. He executed a contract with the corporation under which he was to be paid $8,710, in monthly payments of $300, as back salary and as payment for the purchase of his stock in the corporation. He then obtained the position of manager of a country club at a higher salary. He continued to hold such position during 1968, and he was also a commissioned real estate salesman during that year. During 1968, the petitioner made a number of trips out of the country at his own expense with the hope of making some business arrangements. The dates and destination of such trips were as follows: Place
Entry
Exit
Portugal
3-26-68
4-2-68
Spain
4-2-68
4-8-68
Dominican Republic
5-1-68
6-4-68
Dominican Republic
6-24-68
6-26-68
Portugal
7-13-68
7-20-68
Dominican Republic
8-2-68
8-2-68
The petitioner went to Portugal to investigate the possibility of opening a gambling casino. The record is unclear as to the results *208 of many of such trips. The petitioner rented, and entered, safe deposit box number 1144 on June 28, 1968, at Inter National Bank of Miami; he again entered the safe deposit box on July 2, 8, and 31; on August 13 and 14; on September 20; and on October 8 and 17--all in 1968. In October 1968, the petitioner and two other individuals formed the 21 Executive Club, Inc. (the club). The initial investment made by the petitioner was $11,569, which was used to purchase the facilities and other assets of a lounge in a foreclosure proceeding. On the morning the petitioner purchased such assets, he went into his safe deposit box at the Inter National Bank, as revealed by a signed and dated entry card held by the bank. He removed from the vault sufficient currency to make the $11,569 payment. The petitioner managed the club and had access to all of its resources and assets from its inception and until he sold his interest in 1970. From mid-October 1968 to April 16, 1969, the petitioner used his personal checking account at the Inter National Bank as the club's checking account. An employee of the club deposited its receipts into the petitioner's account. In addition, such employee *209 deposited in such account other funds whose source was unknown to him. The club was chronically short of funds, and often its checks were dishonored because it had insufficient funds. During 1968 and 1969, the petitioner received from the other two owners of the club funds which were to be used by the business: From one individual, he received $8,000 or $9,000 as his initial investment in the club, and from the other, he received approximately $24,500, which represented loans to the club. In 1969, the petitioner loaned the club $7,500 in cash. In 1970, the petitioner sold his ownership interest in the club for $10,000. He received a $2,500 downpayment and a note for $7,500. Later that year, he received full payment on the note, and he deposited such payments in his bank account. However, the club never repaid the petitioner's $7,500 loan. In addition to his other business activities during 1970, the petitioner was employed as a salaried pit boss and dealer at the Casino International, a gambling casino located in Port au Prince, Haiti. In such capacity, the petitioner helped in counting the casino's money after the close of daily business. During the years in issue, the *210 petitioners maintained several bank accounts. Mr. Gonzalez opened a personal checking account at the Inter National Bank of Miami in June 1968, and in May 1969, he closed such account. Mr. and Mrs. Gonzalez had a joint checking account at the Carner Bank of Miami Beach throughout 1968 and 1969. In 1970, Mr. Gonzalez opened and maintained a separate checking account at the Republic National Bank of Miami, and Mrs. Gonzalez opened and maintained a separate checking account at the Jefferson National Bank. They had a joint savings account in 1970 at the Jefferson National Bank, and Mr. Gonzalez held in trust for Mrs. Gonzalez a savings account at the Bank of Miami and at the Republic National Bank, as well as a $1,000 certificate of deposit from the Republic National Bank. Set forth below is a summary of deposits made with Mr. Gonzalez' funds to such bank accounts during the years in issue: Bank
1968
1969
1970
Carner Bank of
Miami Beach
Opening balance
$1.99
$ 2.94
$6.36
Currency
$ 7,696.00
$ 4,262.00
Check
8,849.73
3,066.59
Total
$16,545.73
$ 7,328.59
Inter National
Bank of Miami
Opening balance
280.00
Currency
$16,714.40
$ 2,650.00
Checks
2,680.00
5,170.00
Total
$19,394.40
$ 7,820.00
Jefferson
National Bank
Checking account
Currency
$ 3,330.00
Checks
10,519.78
Total
$13,849.78
Savings account
Currency and
total
$ 500.00
Republic National
Bank
Checking account
Currency
$ 7,400.00
Check
15,267.50
Total
$22,667.50
Savings account
Total a
$ 5,000.00
Bank of Miami
Currency
$ 1,300.00
Check
800.00
Total
2,100.00
Total for year
$35,940.13
$15,148.59
$44,117.28
*211 When the petitioner opened his checking account at the Inter National Bank of Miami in 1968, his initial deposit of $3,000 came from his cash hoard. On November 26, 1968, the petitioner deposited in such account a $2,000 cashier's check which he received as repayment of a loan made to Manuel Garcia, his third cousin, while they were still in Cuba. In 1970, Mrs. Gonzalez, using funds from her account at the Jefferson National Bank, had a cashier's check for $2,250 issued to the petitioner, which he then deposited in his checking account with Republic National Bank. Also deposited in the petitioner's checking account during 1970 was $2,000 in cash which he had received from a fellow worker at the casino in Haiti. The money was given to the petitioner for delivery to the co-worker's mother living in Canada. When the petitioner returned to the United States, he drew a check on his account and had his bank make out a $2,000 cashier's check which he thereupon sent to his co-worker's mother. The owner of the casino in Haiti where the petitioner worked during 1970 gave him $500 in cash as *212 a gift for his daughter for her graduation from school. It was known that the petitioner's daughter was planning to go to Europe that summer, and the gift was to cover the cost of plane fare. When the petitioner came back to see his family, he deposited such funds in his checking account and gave his daughter a check for $500. Finally, in 1970, the petitioner sold a Chevrolet and a Dodge Charger for a total of $2,200 and deposited such amount in his bank account. Each car was sold for substantially less than its cost. During the years in issue, the petitioner made many payments in cash in addition to those which have already been described. Such additional cash payments were made as follows: Description
1968
1969
1970
Charitable
contributions
$ 99.75
$ 99.61
$ 74.00
Medical expenses
984.38
449.92
Mortgage payments
1,568.00
2,352.00
Loan payments to
Ritter Finance
for $600 loan
474.80
240.00 The petitioners paid the following amounts of medical expenses and charitable contributions by check: 1968
1969
1970
Medical expenses
$ 951.50
$ 686.72
$4,265.17
Charitable
contributions
114.75
184.61
311.00
*213 During the years in issue, the petitioner paid the following amounts of interest and real estate taxes on account of his home: 1968
1969
1970
Interest
$ 890.98
$ 844.73
$ 811.02
Real estate taxes
544.45
556.45
621.30
The petitioner often made purchases on credit, and when he purchased an asset such as a car or his home, he borrowed funds to do so and made monthly repayments. He did not always make his payments on time, but eventually he always made the payments. One of his cars was involved in an accident, and because he was dissatisfied with the repair work done on the car, he refused to make any more payments on it and allowed it to be repossessed. Sometime prior to 1971, the petitioner was selected as a target of the narcotics traffickers project (the project). The project was set up by the United States Treasury Department with the aim of curtailing heroin traffic. It involved various agencies of the Treasury Department--Customs and IRS, and information and assistance were supplied by other agencies, such as the Drug Enforcement Administration and the Federal Bureau of Investigation. Initially, each agency submitted information relating *214 to individuals whom they considered to be a major narcotics trafficker. The petitioner was a known associate of suspected gamblers and others who were under the close scrutiny of the FBI. The files of the FBI contain many references to him as an associate of persons thought to be racketeers. The files of Customs also included many references to his associations with some of the same persons mentioned by the FBI. In addition, at least one informant described the petitioner as having been involved in smuggling heroin. For these reasons, he was selected as a target of the project by Treasury officials, and his case was then assigned to a group of special agents of IRS who were working with the project so that they could make a tax investigation of him. The special agent conducted an extensive investigation of the petitioner, and with the assistance of the revenue agent, computed the petitioner's income on the basis of his bank deposits plus cash expenditures. The special agent concluded that there was no evidence that the petitioner was smuggling narcotics. However, based on his analysis of the bank deposits and cash expenditures by the petitioner, the special agent determined *215 that there were substantial understatements in the petitioner's income during the years in issue, and that such omissions were willful and with the intent to evade taxes. During the investigation, the petitioner told the special agent about the cash hoard which he had brought from Cuba and claimed that many of the bank deposits came from such hoard. The special agent did not believe the petitioner's cash hoard story because he offered no documentation or other evidence corroborating it, and the agent thought that the petitioner did not live, during the years in issue, in the manner of an individual with substantial cash resources. In addition, the petitioner exercised his Fifth Amendment rights and declined to answer many of the special agent's questions, which would have helped to establish the existence of the cash hoard and to explain some of the deposits. After the completion of the investigation, the special agent recommended that the petitioner be indicted for tax evasion; but after hearing the petitioner's evidence in this case, the special agent testified that he would not have recommended criminal prosecution of the petitioner for tax evasion had the petitioner given him *216 such a detailed account of the cash hoard and various other transactions which he presented in this case, although the agent affirmed the good faith and reasonableness of his recommendation to prosecute, given the information he had before him. He also testified that he treated the petitioner in the same manner as any other taxpayer, and he was not aware of any Government employee who treated the petitioner unfairly. In conducting his investigation, the special agent used many of the standard tools for conducting a felony investigation: The postal services made notes of the names of persons writing to the petitioner; long distance toll records were obtained and the identity of the persons called was ascertained by regional offices of Customs; and various individuals were questioned. Also, the petitioner's name was kept on a Soundex listing, which is a watch list kept by Customs. The special agent testified that the petitioner's name was already on that list prior to his investigation, and thus, he did not place such name thereon. The agent also said that he would have had no hesitation in submitting a name to such listing if he thought it was necessary. The special agent *217 explained that the purpose of collecting the mail and phone information was to supply leads as to possible income sources or ways in which the petitioner was expending his funds. For example, such information might reveal the names of stockbrokers, banks, or other persons with whom the petitioner was conducting business and from whom he might derive income.The toll call information did not involve wire tapping or otherwise listening in on phone conversations. Sometime prior to mid-1972, the special agent's report and recommendation of criminal prosecution for tax evasion was submitted to his supervisor. The supervisor, having reviewed the case, sent it on to the Chief, Intelligence Division, and the District Director. The case was then sent to Southeast Regional Counsel, who reviewed all of the evidence and other information and concluded that criminal prosecution ought to be initiated because there was sufficient evidence to indicate guilt beyond a reasonable doubt, and there was a reasonable probability of conviction. On June 21, 1972, the Regional Counsel then prepared a criminal reference letter (CRL) for the Justice Department, in which he stated his findings and conclusions *218 and requested that criminal proceedings be instituted.On June 29, 1972, the petitioner was indicted for criminal tax evasion for the years 1968, 1969, and 1970. While the petitioner was under indictment, the district narcotic traffickers program conducted a routine annual review of all the cases of individuals who were known or suspected of being connected with the narcotics trade or with other illegal activities. On August 2, 1972, the petitioner's file was reviewed, and in light of the pending indictment, the review panel determined that no audit action was necessary at that time. The reason for such recommendation was that for the years under indictment, there had already been a complete audit, and an additional one was unnecessary at that time. The petitioner's trial on tax evasion was held during November 1972. Upon the conclusion of the Government's presentation, the court granted the petitioner's motion for a judgment of acquittal with respect to all counts in the indictment. In this case, the petitioner testified that because of criminal proceedings instituted against him by the United States Government, he has experienced great difficulty in finding employment. *219 According to his testimony, many people who would otherwise have employed him or entered into business dealings with him have decided not to do so, simply because they are afraid that they will become subject to IRS scrutiny as a result of their relationship with the petitioner. In his notice of deficiency for the years in issue, dated April 30, 1973, the Commissioner determined deficiencies in the petitioner's income taxes by use of the bank deposits and cash expenditures method. From the total of the bank deposits and cash expenditures found by him, he subtracted various non-income deposits and cash payments which may have come from the petitioner's bank accounts. The Commissioner also determined that the additions to tax for fraud should be imposed, but after the trial in this case, he reconsidered and has abandoned that determination. OPINION 1. Collateral Estoppel
The first issue for decision is whether the judgment of acquittal secured by the petitioner in his criminal tax evasion case collaterally estops the Commissioner from contesting the deficiencies herein. The petitioner recognizes the well established rule that *220 a jury verdict acquitting a taxpayer of tax evasion does not collaterally estop the Commissioner from seeking tax deficiencies and additions to the tax for fraud in a subsequent civil tax case covering the same years. Helvering v. Mitchell,303 U.S. 391 (1938); Murphy v. United States,272 U.S. 630, 632-633 (1926); Chantangco v. Abaroa,218 U.S. 476, 481 (1910); Stone v. United States,167 U.S. 178, 186-189 (1897). However, the petitioner seeks to distinguish the holding of such cases by contending that it is limited to situations wherein a jury verdict led to a judgment of acquittal, but that where, as here, the judge in the criminal case granted a motion for a directed verdict for acquittal, a different rule should apply. We must reject such contention because the Supreme Court has held that a different rule does not apply when there has been a directed verdict of acquittal. United States v. Real Estate Boards,339 U.S. 485, 492-494 (1950). The Court stated that *221 a directed verdict of acquittal merely means that no reasonable man could find guilt beyond a reasonable doubt; guilt may have been shown beyond a preponderance of the evidence, but that question was not resolved by the judgment of acquittal; consequently, such a judgment is without collateral estoppel effect in a subsequent civil case between the same parties and arising out of the same transaction. We followed such holding in Neaderland v. Commissioner,52 T.C. 532 (1969), affd. 424 F. 2d 639, 643 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970). 2. Manner of Conducting Investigation
The next issue for decision is whether the manner of selecting and conducting the investigation of the petitioner calls for any action on our part. The petitioner claims that he was selected for investigation for improper reasons, that he was harassed during the investigation, and that the deficiencies should be declared void, or in the alternative, the burden of proof should be shifted to the Commissioner. A resolution of this controversy requires a weighing and balancing of sometimes conflicting social and individual objectives. On the one *222 hand, we have all been disturbed by the spread of the narcotics business in recent years, and we are anxious to have our Government make vigorous efforts to put an end to such business. On the other hand, the existence of an investigation of a person may impose severe hardships upon him, and each of us should be assured that our Government will not even undertake an investigation without ample reason for doing so. When we apply such considerations to the facts of this case, there are no grounds for granting the action requested by the petitioner. We can understand and sympathize with the petitioner's feelings that he was unjustifiably investigated by the Government for illegal narcotics activities, since no evidence was ever found to substantiate such an alleged connection. Nevertheless, the facts of record show that the initiation of the Government's probe of the petitioner was undertaken in good faith and with ample reason to suspect that the petitioner might be connected with illegal activities: there was at least one informant's report connecting him with such business, and on many occasions, he had been observed associating with suspected gamblers and racketeers. Cf. *223 Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). Moreover, to require that an investigation always result in an indictment would be plainly unreasonable. The Government must have certain latitude in pursuing leads. Not every lead will bear fruit, but that does not mean, nor should it, that such leads ought not be pursued. Since there was adequate reason for making the investigation, the acquittal of the petitioner does not make the investigation improper. Nor was it improper for the IRS to conduct a tax investigation of the petitioner because he was thought to be in the narcotics business. The purpose of the IRS is to collect all taxes owed, and it is generally recognized that persons engaged in illegal businesses often neglect to report all the income derived from their illegal activities. Cf. Greenberg's Express, Inc. v. Commissioner, supra.Thus, the Commissioner often finds that investigations of such persons prove very fruitful. We can appreciate that anyone may feel that he is harassed when he is the subject of an investigation by a number of Government agencies, including the IRS, the Customs agency, the FBI, and other *224 police forces. The petitioner, because of his experiences, may be especially sensitive to governmental investigations. Yet, we have found nothing improper in the manner in which the investigation was conducted. The tools used in conducting the felony investigation were those commonly employed in such cases, and there was no evidence that they were misused in making this investigation. There is no reason to doubt that the special agent had adequate reason for his recommendation of criminal prosecution, based on the information then available to him; nor is there any reason to doubt that any other officials of the Government who reviewed and approved such recommendation acted in good faith in doing so. At that time, the information supplied by the petitioner relating to the existence of his cash hoard and to the source of his bank deposits was incomplete, because he invoked the privilege against self-incrimination. The special agent testified in this case that upon hearing the evidence presented by the petitioner at this trial, he would not have recommended criminal prosecution. Thus, had the petitioner made a full presentation of the evidence during the investigation, he might *225 have brought an early end to the investigation.
The petitioner argues that several of the IRS employees recommended that the case be terminated at an earlier stage, but his support for such argument is based upon a misunderstanding of the action by the panel in 1972 when it merely indicated that no further audit activity was required at that time. He also misconstrues the testimony of the special agent who merely stated that based on what he now knows, he would not recommend prosecution. Several witnesses for the Government testified that this case has been treated no differently than the ordinary tax case. However, we are not altogether convinced by such testimony. After the trial of this case, the Commissioner dropped his claim for the fraud penalty, but we wonder whether a criminal prosecution of the petitioner would have been recommended and whether the fraud penalty would have been claimed in this case, if he had not been suspected of being in the narcotics business. We can understand the Government's reluctance to believe the petitioner's statement regarding his cash hoard; yet, there is no evidence of direct fraudulent omissions or deductions, and the deficiencies are *226 relatively small. Although we are concerned that the case against the petitioner may have been pressed more vigorously because of his suspected narcotics business, we are not prepared to find, as a fact, that there has been discrimination against the petitioner. Cf. Yick Wo v. Hopkins,118 U.S. 356 (1886); United States v. Ojala,544 F. 2d 940 (8th Cir. 1976); United States v. Berrios,501 F. 2d 1207 (2d Cir. 1974). Moreover, the Commissioner has now dropped his claim for fraud. Accordingly, there is no ground for nullifying the notice of deficiency or for shifting the burden of proof with respect to the deficiency. 3.The Statute of Limitations for 1968
The parties agree that the Commissioner's deficiency determination for the year 1968 is barred by the usual 3-year statute of limitations provided for in section 6501(a), unless one of the exceptions thereto is operative. The Commissioner relies on section 6501(e), which provides a 6-year statute of limitations in the event a taxpayer fails to report more than 25-percent of *227 his gross income. The Commissioner bears the burden of establishing the applicability of the 6-year statute of limitations. Stratton v. Commissioner,54 T.C. 255, 289 (1970); Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner,52 T.C. 240, 254 (1969), affd. 435 F. 2d 53 (2d Cir. 1970); Peters v. Commissioner,51 T.C. 226, 230 (1968). On his 1968 Federal income tax return, the petitioner reported gross income of $5,849.95. Thus, for the 6-year statute of limitations to be applicable, the Commissioner must establish that the petitioner omitted from gross income at least $1,463.00, and we hold that the Commissioner has carried such burden. At the outset, it is clear that the petitioner failed to report some income received by him in 1968. He received salary and other payments from A-1 Stationers during that year totaling $3,600.00; yet, on his return for that year, he reported only $2,600.00 from A-1 Stationers. The Commissioner determined that the petitioner received additional unreported income on the basis of an analysis of his bank deposits and cash expenditures. He found that during 1968, the total amount *228 of bank deposits made by the petitioner amounted to $35,896.81, [2] and that his total cash expenditures were $12,432.96. After subtracting the nontaxable items found by him and the income reported by the petitioner, the Commissioner determined that $21,437.08 of unreported taxable income was received by the petitioner in 1968. However, the petitioner has convinced us that gross income must be reduced by an additional $2,000.00, representing the loan repayment he received from his cousin and deposited in his bank account.The other explanations offered by the petitioner to show that the remaining unexplained bank deposits and cash expenditures are not income depend on the petitioner's claim of a cash hoard. Thus, we must decide whether we believe there was a cash hoard, its initial amount, the amount remaining during each of the years in issue, and whether it was the source of funds for each transaction claimed by the petitioner.
Such questions are difficult to resolve; however, their difficulty does not relieve us of our responsibility of using our *229 best judgment as the fact-finder in reaching the conclusion which accords most satisfactorily with the record as a whole, taking into account the demeanor and credibility of the witnesses, including the petitioner. Weighing such factors and reviewing all of the evidence leads us to the conclusion that the petitioner did in fact flee from Cuba with a cash hoard. He was a man of substantial means with funds stored in vaults which were easily obtainable by him. The petitioner's refusal to sell his small boat at sea when it developed engine trouble and his explanation that the money was located in that boat strongly support the existence of the cash hoard, particularly when one considers the fact that his refusal subjected him and his passengers to increased danger not far from the Cuban coast. In addition, his account of such events was corroborated, at least in part, by other disinterested witnesses. However, the petitioner himself was vague and uncertain as to the amount of such funds, roughly estimating them to toalt $325,000. We are not convinced that the hoard was nearly that large, although for purposes of this case, we find it unnecessary to place a precise figure on the hoard.
*230 The Commissioner contends that we should place no credence in the petitioner's cash hoard story with respect to the years in issue based on his lifestyle: the petitioner borrowed funds, paid for purchases in installments, and on occasion, was late in making his payments. The Commissioner would have us conclude that such are not the actions of a man with substantial financial resources.Yet, the Commissioner's position is contradictory: on the one hand, he points to the petitioner's lifestyle to demonstrate that he did not have substantial financial resources; on the other hand, he has determined that the petitioner did in fact have substantial amounts of money being deposited and spent during the years in issue. On the whole record, it appears clear to us that the petitioner had substantial resources during the years at issue; his lifestyle reflects merely that, in some respects, he spent his money conservatively. We are still left with the question of whether his resources were derived from the remainder of his cash hoard or whether they may have come from other taxable sources. No evidence was presented to suggest that, from the time the petitioner arrived in this country *231 in October 1960 until 1966, he had any funds with which to live other than the cash hoard. Clearly, his wife and family used such funds until his return from imprisonment in 1962. He also lost approximately $8,000 in a venture shortly after he came to the United States. In 1965 or 1966, he may have deposited $40,000 or $50,000 in his bank accounts from his hoard. Throughout 1966 and prior to his opening of the club in October 1968, the petitioner did not earn substantial income; indeed, he left A-1 Stationers because he was not earning enough money. In addition, prior to October 1968, he made a substantial number of trips out of the country at his expense, one of them lasting over a month. When all of these transactions are considered, it seems likely that the petitioner made substantial withdrawals from his cash hoard to finance all his activities and business transactions and to cover his living expenses. By October 1968, the petitioner may not have completely depleted his initial cash hoard and the $35,000 repayment he received when he arrived in this country, but we doubt that much remained of those funds. In summary, we are satisfied that the petitioner brought a cash hoard *232 from Cuba, but we are not convinced that it was as large as he claimed, nor that he still had $200,000 of such funds in 1968 as claimed by him.
Having reached those conclusions, we now turn to a consideration of non-income items claimed by the petitioner for 1968. He contends that the $11,569.00 used to purchase assets for the club came from his funds stored in his safe deposit box at the Inter National Bank. There is evidence that he entered that box on the morning of the day he made such purchase. Thus, it appears that he used the funds locked in that vault, and we are satisfied that such funds came from his cash hoard.Consequently, to the extent the petitioner was charged with income as a result of such expenditure, we conclude that an appropriate adjustment should be made. Finally, the petitioner claims that his initial deposit of $3,000 in his checking account at the Inter National Bank also came from his cash hoard, and again, it is our judgment that the hoard was the source of such funds, necessitating an additional reduction in the Commissioner's determination of gross income. The petitioner has offered no explanations with respect to other deposits; thus, we do not think *233 the cash hoard was used with respect to them, and we find that all such deposits represent unreported gross income. Since the amount of such unreported income greatly exceeds $1,463.00, we hold that the Commissioner has established an omission of more than 25 percent of the petitioner's gross income for 1968; that such year is subject to a 6-year statute of limitations; and that the Commissioner's April 30, 1973, notice of deficiency is timely. 4. The Deficiencies
a. 1968
In addition to the adjustments described in the preceding section of this Opinion, the petitioner has established that he is entitled to additional deductions beyond those allowed by the Commissioner. Our Findings of Fact set forth the amounts he expended, whether by check or cash, for interest, real estate taxes, medical expenses, and charitable contributions. He should be given credit for those items in computing the decision in accordance with Rule 155, Tax Court Rules of Practice and Procedure.
b. 1969
The petitioner claims that the Commissioner improperly included in his gross income a $7,500 cash loan he made to his club from his cash hoard.While the petitioner's claim is not entirely *234 free from doubt, we are persuaded that such loan had its source in the petitioner's hoard. However, we are not satisfied that any significant or substantial amount of funds remained in his hoard after that loan and that, therefore, no other deposits can be attributed to such source. Our conclusion as to the exhaustion of the hoard is supported by the fact that during the trial of this case, the petitioner testified that he still possessed some of his cash hoard, but when the Commissioner's attorney offered to concede this case if the petitioner showed him, under Court supervision, such funds, the petitioner refused to do so. In our view, even taking into account the petitioner's fear of governments, such action, at the very least, is strong evidence that the size of the petitioner's hoard was far less than he claimed. The petitioner is also entitled to reduce gross income as determined by the Commissioner by $600, the amount of borrowed funds he deposited into his bank account during 1969. Finally, in computing the petitioner's income for 1969, he is entitled to deductions for interest, real estate taxes, medical expenses, and charitable contributions which he paid during the year, *235 as set forth in our Findings of Fact. c. 1970
Adjustments to be made to the petitioner's 1970 income as determined by the Commissioner include various amounts which were deposited into the petitioner's bank account but which do not represent taxable income. First, $2,200 was deposited, which represented the proceeds from the sale of his two cars, both of which were sold at a loss. Next, there was the $7,500 which represented merely a return of his capital from the sale of his 21 Club stock. Also, there was a transfer of funds from one bank account to another in the amount of $2,250. In addition, there was a deposit of $2,000 which he brought from Haiti and transferred to the mother of a fellow worker. Similarly, there was a deposit of $500 which he brought from Haiti and transferred to his daughter as a gift from a friend in Haiti. Finally, in computing taxable income, the petitioner is entitled to deductions for interest, real estate taxes, medical expenses, and charitable contributions, as set forth in our Findings of Fact. Although the petitioner claims a deduction of $7,500 because he never received payment for his loan to A-1 Stationers, on this record, we are *236 without sufficient facts to conclude that he is entitled to it. We are given no information with respect to whether A-1 Stationers could have afforded to pay off the loan; its reason for not doing so; the actions taken by the petitioner to compel repayment; or the capacity in which the petitioner made such loan. In conclusion, it is apparent that there are many gaps in this record which made it difficult to resolve many of the problems presented herein in a completely satisfactory manner. While the petitioner described some deposits in detail, he offered no testimony or other evidence with respect to many others. Consequently, no further adjustments in the petitioner's income during the years in issue are warranted by this record. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
a. The Stipulation of Facts does not reveal whether this deposit was check or currency.↩
2. The actual amount of deposits was slightly in excess of the amount computed by the Commissioner, but we have used his figure.↩