**LYNCH CORPORATION, an Indiana corporation, Appellant,**

v.

**MII LIQUIDATING CO., a South Dakota corporation (formerly M-tron Industries, Inc.), et al., Appellees.**

**No. 82–2307–SD.**

United States Court of Appeals, Eighth Circuit.

Argued June 12, 1983.

Decided Sept. 14, 1983.

Gregory L. Curtner, Detroit, Mich., for appellant.

Thomas C. McGowan, Omaha, Neb., for appellees.

Before LAY, Chief Judge, SWYGERT, Senior Circuit Judge,[1] and ARNOLD, Circuit Judge.

PER CURIAM.

This is an appeal by plaintiff-appellant Lynch Corporation ("Lynch") from a judgment of the district court finding defendant MII Liquidating Company (formerly M-tron Industries, Inc.) not liable for certain losses incurred by Lynch as a result of alleged fraud and breach of contract. Following a nine-day bench trial, the district court ruled that Lynch's business losses were not caused by M-tron's conduct prior to its acquisition by Lynch, but rather were due to certain regulations promulgated by the Federal Communications Commission ("FCC") which seriously affected the demand for Lynch's product. We affirm the judgment of the district court in regard to Lynch's fraud and misrepresentation claims, but reverse the district court findings concerning certain tax payments, discussed *infra*.

I

M-tron is a manufacturer of quartz crystals. These crystals were used in citizen's band radios, as well as other electronic products. In 1975 Lynch began looking for another business to acquire, both to diversify its operation and to take advantage of certain tax benefits. Because the tax benefits would begin to expire in 1976, there was apparently "some urgency" in finding a suitable acquisition.

In July 1975 Lynch's parent company loaned Lynch the services of Dr. Donald Slocum, Executive Director of Corporate Development, for the purpose of investigating M-tron as to its suitability for acquisition. In this capacity, Dr. Slocum met frequently with M-tron's president, Delbert A. Gaines. Following extensive investigation and negotiations by Dr. Slocum, on April 15, 1976 Lynch purchased the assets of M-tron for approximately $5.3 million dollars. Lynch continued the business under the former corporate name (hereinafter the "new M-tron").

The acquisition contract between Lynch and old M-tron contained several warranties to ensure full disclosure of M-tron's business operations. In pertinent part, these provisions are as follows:

Section 1.18: No representation or warranty by M-tron here nor any statement or certificate furnished or to be furnished to Lynch pursuant hereto or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading;

Section 5.8: During the period from March 31, 1975 to the Closing Date, there shall not have been any material adverse changes in the properties or prospects of M-tron;

Section 1.16: M-tron has no knowledge that any substantial customer of M-tron intends to reduce materially its business with M-tron.

In the year following its acquisition, M-tron earned approximately $2.5 million dollars. Thereafter, however, the company suffered severe losses, and as the district court found, "subsequent earnings [were] far below expectations of any of the parties." The parties agree that three occurrences caused new M-tron's difficulties, but disagree as to the importance of each occurrence. First, roughly forty percent of M-tron's production was purchased by two of the largest producers of CB radios, E.T. Johnson Company and Pathcom. During 1975 and at the time of acquisition, M-tron was able to sell its entire production and, in fact, had a considerable backlog of orders. In July 1976, however, Pathcom cancelled one such sizeable back order. Factor one

1. The Honorable Luther M. Swygert, Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit.

above was, in part, prompted by factors two and three: a ruling by the FCC increasing the number of channels available to CB radios from twenty-three to forty, and increased competition from foreign manufactured radios. The effect of the FCC action was to reduce the number of crystals needed to manufacture CB radios from twelve to fourteen to approximately one or two, because certain technology was cost effective at forty channels but not at twenty-three. As such, M-tron's customers obviously needed fewer crystals and hence M-tron's business suffered.

Lynch filed suit in April 1978 against the directors, officers, and shareholders of M-tron (now MII Liquidating Company), alleging essentially that defendants were aware of these adverse developments before the acquisition. Lynch argued therefore that M-tron's failure to disclose constituted a breach of the warranties quoted above, as well as fraud and misrepresentation. The district court disagreed finding instead that "from the evidence . . . the sole proximate cause of the drastic reduction of new M-tron's business prospects in 1976 was the FCC Operating Rules Revision of July 27, 1976." This appeal followed.

## II

■ Our review is limited to whether the district court's findings are clearly erroneous. Fed.R.Civ.P. 52(a). We must accept these findings unless left with the "definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), and may not substitute our interpretation of the evidence merely because we "might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent." *United States v. Real Estate Board*, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950), *quoted in Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 102 S.Ct. 2182, 2190, 72 L.Ed.2d 606 (1982). We cannot say that the district

court's determination was clearly erroneous in this case.

■ Lynch contends that the district court clearly erred in finding that "the sole proximate cause of the drastic reduction of new M-tron's business prospects in 1976 was the FCC Operating Rules Revision of July 27, 1976." But regardless of whether this was the sole cause, or one of a number of causes, Lynch was required to show that M-tron knew of the revision and other adverse information before the acquisition. If such evidence were furnished, then Lynch would establish its claim that M-tron violated the disclosure provisions of the contract or materially misrepresented information then available. Lynch seems to recognize this distinction in the latter portion of its brief where it states that "it is *irrelevant* whether the ultimate actual injury was caused by the action of the Federal Communications Commission, or whether it was caused by increasing Japanese imports, or whether it was caused by a shift in its major customers to PLL circuitry which reduced their crystal requirements." Brief of Appellant at 30 (emphasis in original). Our inquiry then is whether there is substantial evidence to support the district court's conclusion that "plaintiff failed to prove its causes of action based on deceit, fraud, negligent misrepresentation, and fraudulent conveyance." We conclude that there is substantial evidence supporting the district court opinion and, under the circumstances, we cannot say that its findings were clearly erroneous.

The district court found that the officials of both M-tron and Lynch anticipated the FCC to authorize CB radios with additional channels. These new radios would use the PLL technology, thereby reducing sharply the demand for M-tron's crystals. Significantly, there was evidence that Dr. Slocum relied not on alleged misrepresentations by M-tron officials as to when the FCC would rule, but rather contacted several sources within the FCC. As it developed, the FCC acted much sooner than Dr. Slocum had been led to believe, and the district court accordingly found that "Dr. Slocum was

misled by FCC officials as to the timing of the new rule, elimination of the two-tier market, and the subsequent rapid approval of radios designed with PLL technology."

In addition to holding that Lynch had not relied on statements made by old M-tron officers in making its decision to acquire M-tron, the district court also was unable to find "any material misrepresentations in this record made by old M-tron officials." To the extent that any business predictions made by old M-tron proved erroneous, the district court held that it was due to the actions of the FCC. There was testimony by the president of Lynch that he was aware of "some risk" in the venture. And although it may be true, as Lynch argues, that erroneous predictions are actionable where one party has superior knowledge of certain matters, it is not clear to us that this was the situation. The record is replete with references to the investigation conducted by Dr. Slocum about PLL circuity, the crystal market, and the impact of imports upon the CB radio market. We cannot hold as a matter of law that old M-tron had superior knowledge in these areas.

In summary, we rule that the district court's holding, involving as it did often sharply conflicting testimony, was not clearly erroneous. Whether the FCC ruling was the sole cause of M-tron's misfortune, or one of a number of causes, the district court's findings of non-reliance and non-misrepresentation are not clearly erroneous.

### III

■ A second issue raised by Lynch concerns the adequacy of the district court's finding of fact and conclusions of law. Lynch argues that the district court failed to state its findings with sufficient clarity and specificity to afford this court and the parties an understanding of the basis of the decision. This point has no merit for two reasons. First, at the conclusion of trial the district court announced that it would file

proposed findings and conclusions, but would not enter judgment immediately in order that the parties would "mention issues which counsel feels were presented but not addressed in the memorandum opinion." In spite of this express opportunity to supplement the opinion, Lynch made no mention of the allegedly deficient findings of which it now complains. Although we do not decide whether this constitutes a waiver, and there is some authority which so holds, see *Evans v. Sun Tree Growers and Shippers, Inc.*, 531 F.2d 568, 570 (Temp. Emer.Ct.App.1976); *McMahon v. Caribbean Mills, Inc.*, 332 F.2d 641, 643 (10th Cir.1964), we believe that at the very least it suggests the district court's opinion is not as flawed as Lynch now alleges. Cf. *Allied Van Lines, Inc. v. Small Business Administration*, 667 F.2d 751, 754 n. 1 (8th Cir.1982).

Second, it is settled that the findings of a district court "are adequate if they afford a reviewing court a clear understanding of the basis of the trial court's decision." *Allied Van Lines, Inc., supra*, 667 F.2d at 753 (citations omitted). "[T]he trial court does not need to make specific findings on all facts but only must formulate findings on the ultimate facts necessary to reach a decision." *Id.*, 667 F.2d at 751; *Falcon Equipment Corp. v. Courtesy Lincoln Mercury*, 536 F.2d 806, 808 (8th Cir.1979). Our review of the district court's findings, mandated by our discussion in part II, satisfies us that this standard has been met.

### IV

■ The final issue in this appeal concerns certain tax payments which, Lynch alleges, new M-tron wrongly withdrew from Lynch's assets to discharge tax liabilities of old M-tron. Section 8.5(e) of the contract provided that Lynch would assume no liabilities for any unpaid taxes owed by old M-tron "resulting from . . . the execution and consummation of this Agreement." [2] Lynch argues that the evidence

---

2. Section 8.5(e) provides:

Anything in this Agreement contained to the contrary notwithstanding, Lynch shall not

undertake to, and shall not be required to pay, perform, fulfill, or discharge any claims

presented at trial was uncontroverted that new M-tron withdrew $72,500 from Lynch's assets to make quarterly tax deposits on old M-tron's account to cover taxes incurred as a result of depreciation recapture and investment credit recapture. Thus, Lynch contends, new M-tron converted these funds to discharge a tax liability which resulted from the sale of old M-tron in violation of section 8.5(e) of the contract.

The evidence presented by Lynch consisted of testimony by Lynch officers Morris and McLaughlin, and a letter from the accounting firm of Ernst & Ernst. In pertinent part, that letter provided as follows:

> In July 1976, a tax deposit of $45,000 was made by New M-tron relating to one-fourth of the estimated tax liability of The Company for the period April 1, 1976 to April 15, 1976, determined as follows:
>
> | | |
> |---|---:|
> | Tax based on adjusted book income (see below) | $35,000 (3) |
> | Depreciation recapture (estimated by management) | 67,000 |
> | Investment credit recapture as a result of The Company's sale of assets (estimated by management) | 78,000 |
> | Estimated total federal income tax | $180,000 |
> | One-fourth of above | $ 45,000 (2) |
>
> The second tax deposit is due on or before September 15, 1976, and management has informed us that they intend to make a second deposit equal to the first ($45,000) on that date.

Both McLaughlin and Morris testified that the second payment, noted in the excerpt above, had indeed been made by new M-tron. The district court, although assuming that the tax deposits had been made, denied Lynch's claim on two grounds. First, the court reasoned that if *Lynch* had no tax liability at the end of the year, the deposits made would be refunded to Lynch. Thus, the court held the "[t]he fact that tax deposits were made does not prove . . . that *plaintiff* actually paid any income tax . . . ." (emphasis added). Second, the court emphasized that the amounts paid for depreciation recapture and investment credit recapture were estimates; as such, the failure of Lynch to prove actual tax liability

defeated its claim. Lynch says that the district court was in error; we agree.

Both the district court and old M-tron stressed the fact that there was no evidence Lynch paid any income tax for that year. But this is irrelevant; the taxpayer we are concerned about is old M-tron, not Lynch. The evidence, not contradicted by M-tron, is that Lynch assets were withdrawn to pay for tax liability of old M-tron incurred as a result of the sale. Moreover, it is of no significance that the deposits were "estimates"; the deposits were nonetheless taken from Lynch and given to the government.

M-tron's only argument is that there was testimony establishing that Lynch had agreed to assume some tax liabilities of M-tron. Under the contract, however, Lynch agreed to pay taxes arising in the "ordinary course of [old] M-tron's business . . . ." Section 8.5(a). Lynch does not contest its responsibility to pay this tax, reflected in the Ernst & Ernst letter as "tax based on adjusted book income." *See supra.* The sole issue is whether Lynch assets paid M-tron's taxes resulting from the acquisition. Because M-tron has presented *no* evidence tending to rebut Lynch's proof, we are compelled to find the district court erred.

For the reasons we have outlined, the judgment of the district court is reversed in part and affirmed in part.[3]

---

against, or any liabilities or obligations of [old] M-tron.

   *      \*      \*      \*      \*      \*

    (e) for taxes, including without limitation, federal, state, and local income, franchise, documentary and transfer taxes, arising out of or resulting from, or imposed by reason of, the execution and consummation of this Agreement;

it being understood that all such items listed in subsections (a) through (e) inclusive, above, shall be the obligation of [old] M-tron.

**3.** Lynch's "Motion to Strike Appellees' Brief" is granted to the extent that no depositions wrongly included by M-tron were considered in this decision.