## Case No. 10,388.

### The NYMPH.

#### [1 Sumn. 516.] [1]

Circuit Court, D. Maine.    May Term. 1834.[2]

##### Cod-Fishery License—Act of 1828.

1. Since the act of 1828. c. 119 [4 Stat. 312]. the mackerel fishery cannot be lawfully carried on under a license for the cod fishery. in pursuance of the act of 1793, c. 8, § 32 [1 Stat. 316].

2. Semble, that before the act of 1828 it could not be carried on under such a license, unless so far as it was an incident to the cod fishery; as, for instance, for bait, or provisions for the crew.

[Cited in The Harriet, Case No. 6,099.]

3. The cod fishery is a trade within the true intent and meaning of the 32d section of the act of 1793, c. 8. So is the mackerel fishery. "Trade" in the act is used as equivalent to occupation, employment, or business, for gain or profit.

[Appeal from the district court of the United States for the district of Maine.]

This was the case of a libel of seizure against the Nymph, a vessel licensed for the cod fisheries [Bibbord, claimant]. And the charges were: (1st.) That during the continuance of the license the schooner was employed in a trade other than that for which she was licensed, contrary to the 32d section of the coasting act of 1793 [1 Story's Laws, 285] c. 52 [8]; (2d.) that during the same period she proceeded on a foreign voyage, without first giving up her enrolment and license, contrary to the 8th section of the same act. The district court pro-

---

1 [Reported by Charles Sumner, Esq.]
2 [Affirming Case No. 10,389.]

nounced a decree of acquittal upon the facts [Case No. 10,389], and from that decree the United States appealed to this court.

Dist. Atty. Anderson, for the United States.
C. S. Daveis, for claimant.

STORY, Circuit Justice. There are in this case two points; one of law, upon which, having been fully argued, the court will now pronounce its opinion; and the other of fact, which will be open for argument at a future term, if in the mean time the cause is not otherwise disposed of. The schooner was duly licensed in October, 1832, to be employed in the cod fishery, pursuant to the coasting and fishery act of 1793, c. 52 [1 Story's Laws, 285; 1 Stat. 316, ch. 8]. And the allegation made at the bar is, that she was during the existence of that license employed in the mackerel fishery, which, it is contended, is a trade other than that for which she was licensed; and consequently, that she is subjected to forfeiture under the 32d section of the act. Assuming, that she was so employed in the mackerel fishery, it is contended; first, that the mackerel fishery is not a trade within the meaning of the 32d section of the act; and, secondly, that if it be, still the license for the cod fishery includes the right to be employed in the mackerel fishery. The 32d section declares, that if any licensed ship or vessel "shall be employed in any other trade than that, for which she is licensed," she, with her tackle, &c. shall be forfeited. And the first question is, in what sense the word "trade" is used in this section. The argument for the claimant insists, that "trade" is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word "trade" is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a trade. Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoe-maker, though some of these may be, and sometimes are, carried on without buying or selling goods. It is in this extended sense, that the word was understood in construing this very section by the circuit court in the case of The Eliza [Case No. 4,346], and by the supreme court in the case of The Active, 7 Cranch [11 U. S.] R. 100, 106. In neither of these cases was the vessel employed in traffic in the strictest sense; but merely in the transportation of merchandise on freight, or for hire. See Com. Dig. "Trade," A. D. 5; 2 Co. Inst. 621, 668. See, also, The Two

Friends [Case No. 14,289]; The Three Brothers [Id. 14,009]. But the act itself furnishes abundant proof, that "trade" in the 32d section is used in the more enlarged sense already alluded to; and indeed this is the only sense which will satisfy the requisitions of the act. We are not to enlarge penal statutes by implication, so as to cover cases within the same mischiefs, though not within the words. But, on the other hand, we are to ascertain the true legislative sense of the words used; and that sense being once ascertained, courts of justice are bound to give effect to that intent, and are not at liberty to fritter it upon metaphysical niceties. The very words of the 32d section show, that "trade" must there mean something more than mere traffic in goods or commercial buying and selling. The words are, "if any such ship or vessel shall be employed in any other trade, than that for which she is licensed." It is then supposed, that she is to be licensed for some trade, and that she may be employed in another trade. The only cases, in which a license is authorized and required, are for vessels to be employed in the coasting trade, or the whale fishery, or the cod fishery. The 32d section equally applies to each of these employments; and each of them is, therefore, necessarily contemplated to be a trade in the sense of the act. Indeed the coasting trade is ordinarily not a traffic of buying and selling, but a transportation of goods for hire. And there is no more difficulty, in propriety of language, in denominating the whale fishery the whale trade, and the cod fishery the cod trade, than in denominating the coasting business the coasting trade. See Reeve, Shipp. p. 216, c. 5, &c.; Bac. Abr. "Merchant and Merchandise," N, 5; 2 Dane, Abr. c. 68, art. 9, § 9. Each embraces the same general notion, employment, occupation, or business for gain or hire, in contradistinction to employments for mere pleasure. It also deserves notice, and, in confirmation of the views already suggested, it may be added, that the charter of Massachusetts of 1628 expressly provided, that all subjects should have the right and liberty "to use and exercise the trade of fishing upon the coast of New England" (1 Haz. Collect. p. 254; Hutch. Collect. pp. 1-23; Ancient Charters and Laws, and Prov. Laws, p. 26; Adams, Fisheries [1822], p. 185); and the provincial charter of 1691 recognised the same right and liberty in the same terms; thus conclusively establishing, that the very fisheries in question were significantly deemed a trade.

The very form of the license, and the other regulations prescribed by the 4th and 5th sections of the act, prove, that trade, employment, and business are used in the act as equivalent terms. Before a license is granted, a bond is to be given, that the vessel "shall not be employed in any trade, whereby the revenue of the United States shall be defrauded." The master of the vessel is to

swear or affirm, "that such license shall not be used for any vessel or any other employment than that for which it is specially granted, or in any trade or business whereby the revenue of the United States may be defrauded." And "no license granted to any ship or vessel shall be considered in force any longer than such ship or vessel is owned, and of the description set forth in the license, or for carrying on any other business or employment, than that for which she is specially licensed." Taking these provisions in connexion with the language of the 32d section, it seems beyond any reasonable doubt, that the whole policy of the act would be defeated, and its manifest intention be evaded, by any narrow definition of the word "trade." It appears to me, therefore, that, unless the court were at liberty wholly to disregard its ordinary duty in the construction of this statute, an employment in the mackerel fishery is a "trade" within its purview.

The next question is, whether the license in the present case, for employment in the cod fishery, includes within its scope a license for a distinct employment in the mackerel fishery. Notwithstanding the ingenious and able argument of the counsel of the claimant, I am decidedly of opinion, that it does not; and I will now proceed to give the reasons for that opinion. A license to be employed in the cod fishery, ex vi terminorum, cannot include any right or privilege except those, which are incident and belong to that particular branch of trade. The license confers on the party whatever is necessary and appropriate to that trade; for a right to carry on any business naturally includes all the usual and customary means, by which the end is to be accomplished. The right to dig, purchase, and use clams, or other bait, to purchase and transport salt, and procure other reasonable equipments for the voyage, are therefore clearly within the scope of the license. And so far as mackerel are or may be used, as a customary bait in the course of the voyage, there can be as little doubt, that the right to fish for and use them for that purpose is also included. And I go further, and freely admit, that any other fish caught in the ordinary course of the voyage, not as a substitute for employment in the cod fishery, but as a mere incident to the principal business, are equally protected by the license. We all know, that halibut, pollock, cusks, and some other fish are commonly caught in the course of such voyages, and sometimes used as provisions, and sometimes preserved for sale. The true ground, upon which all these apparent exceptions rest, is, that they are mere incidents to the principal employment, and not a distinct and separate employment. No man can justly suppose, that a license to carry on the cod fishery authorizes a party to carry on all sorts of fisheries: as, for instance, the whale fishery, the herring fishery, the shad fishery, the salmon fishery, as a principal

employment. That would be to confound all distinctions of trade. It would be to declare, that although the act of 1793 requires a license for the cod fishery, and a distinct license for the whale fishery, any person, who possessed either, could carry on both trades at the same time. Under a license to catch cod, he would be at liberty to institute and carry on a whaling voyage; or, conversely, under a whaling license, he might employ himself wholly in the cod fishery.

It is undoubtedly true (as has been suggested at the bar), that mackerel have for a long time been used as bait in the cod fishery, and caught in the course of the fishing voyage for this purpose. But it is also historically true, that until a recent period the mackerel fishery was carried on solely for this purpose, or by small boats on the coast for the mere supply of the daily market. Within a few years it has become an important branch of trade; and it is carried on as a distinct employment; so that at present, as I learn from the argument at the bar, upwards of 40,000 barrels are annually taken on our coast and put up for use and exportation. In the year 1828, the attention of congress was attracted to this subject; and by the act of the 24th of May, 1828 (chapter 119), it was enacted, that from and after the passage of that act, it shall be the duty of the collector, &c., "to issue a license for carrying on the mackerel fishery" to any vessel, in the form prescribed by the coasting and fishery act of 1793 (c. 8); and that all the provisions of that act, respecting licensed vessels, shall be deemed and taken to be applicable to licenses, and to vessels licensed, for carrying on the mackerel fishery. This act must at all events (it seems to me), be deemed to erect the mackerel fishery into a distinct and independent employment; and to make it distinguishable and disconnected from the cod fishery. Unless this construction be given to the act, I cannot well perceive what bearing or operation the act can have. If a license for the cod fishery will, notwithstanding this act, cover the mackerel fishery, whether carried on in connexion with the cod fishery, or exclusive of it, what possible use can there be for any provision allowing a license for the mackerel fishery? It would be already sufficiently provided for. And, on the other hand, if the mackerel and cod fishery are to be deemed identical, then, under a license for the mackerel fishery, the cod fishery might be pursued. So that, whichever way we look at the act of 1828, it would in this view be, in a judicial sense, a mere nullity. A construction leading to such a conclusion, must be wholly unjustifiable, if any other reasonable interpretation can be given to the act. It is certain, that cod and mackerel are not the same fish; and that employment in the one fishery does not naturally or necessarily include the other. And if it did,

still it was quite competent for the legislature to distinguish the one from the other; to separate their character and advantages; and to allow to one, what it might well deny to the other. It cannot well be denied, that the legislature has in fact made such a distinction. By the act of 1813, c. 34 [2 Story's Laws, 1350; 3 Stat. 49, c. 35], congress have allowed a bounty of twenty cents per barrel upon all pickled fish of the fisheries of the United States, exported from the United States. And they have allowed a very different bounty, according to certain rates of tonnage, to all vessels licensed and employed for certain periods in the bank and other cod fisheries. The bounty upon pickled fish belongs to the exporter; that upon the cod fishery is distributable in a given proportion between the owner and crew of the fishing vessel. It seems to me impossible to contend, that the bounty on tonnage given in the cod fishery can be applied to vessels employed in the mackerel fishery. The terms of the act apply it to the cod fisheries, in which the fish are dried and cured for exportation. In the mackerel fishery the fish are barrelled and pickled, and not cured and dried. The irresistible conclusion is, that the mackerel and cod fishery are not identical trades; and that the acts of congress look to them as known and distinct trades.

It has been said, that before the act of 1828 the mackerel fishery might be exclusively carried on under a cod-fishery license; and if so, it is still lawful, as there are no prohibitory words in that act, which take away the privilege. The answer is, that the conclusion would not follow, if the premises were admitted; for when congress create a distinction between things before united, that distinction must ever afterwards be respected. The severance creates a legal separation between them, so that the one cannot ever afterwards be judicially said to be included in the other. But the premises are not in themselves admissible. A license for the cod fishery could never properly include a right to the mackerel fishery, except so far as the latter might justly be carried on as an incident to the former. It never could in a legal sense justify an employment exclusively in the mackerel fishery; nor could a vessel, exclusively employed in the mackerel fishery, ever be justly deemed employed in the cod fishery for the purpose of the bounty, or for any other purpose. If, under color of a cod-fishery license, the mackerel fishery was in fact carried on, as an exclusive employment, the practice was an abuse of the license, and not a just and appropriate use of it. The practice could not establish its legal correctness. And, indeed, unless my memory misleads me, the very question came, several years ago, before the district court in Massachusetts in some cases, where the bounty was either claimed, or had been received, and the court pronounced against the title.

In every view, therefore, which I am able to take of the law, the defence of the claimant is unsupportable. As to the matter of fact, I propose, with the assent of the claimant's counsel, to let the cause lie over until the next term, in order that in the mean time an application may be made to the secretary of the treasury for a remission, as the case is admitted not to be one for vindictive prosecution; and the principal object has been to procure a decision upon the question of law. I am not aware, that my view of the law differs in the slightest degree from the opinion of the learned judge of the district court. Libel continued.