# UNITED STATES *v.* NATIONAL ASSOCIATION OF REAL ESTATE BOARDS ET AL.

No. 428.   Argued March 31, 1950.—Decided May 8, 1950.

*The Assistant to the Attorney General Ford* and *Victor H. Kramer* argued the cause for the United States. With them on the brief were *Solicitor General Perlman, Assistant Attorney General Bergson, Herbert N. Maletz* and *J. Roger Wollenberg.*

*Roger J. Whiteford* argued the cause for the National Association of Real Estate Boards et al., appellees. With him on the brief was *John J. Wilson.*

*William E. Leahy* argued the cause for the Washington Real Estate Board et al., appellees. With him on the brief was *William J. Hughes, Jr.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a civil action brought by the United States to enjoin appellees[1] from engaging in a price-fixing conspiracy in violation of § 3 of the Sherman Act, 26 Stat. 209, 15 U. S. C. § 3.[2] The core of the case is the charge that the members of the Washington Real Estate Board combined and conspired to fix the commission rates for their services when acting as brokers in the sale, exchange, lease and management of real property in the District of Columbia.

The same conspiracy was charged in a criminal proceeding.[3] The criminal case was tried first. At the end of the Government's case the court granted the defendants' motion for a judgment of acquittal. 80 F. Supp. 350. Appellees then moved for summary judgment in this civil suit, contending that the judgment of acquittal in the criminal case is res judicata here. That motion was denied.[4]

---

[1] National Association of Real Estate Boards, a nation-wide incorporated trade association; Herbert U. Nelson, its executive vice-president; Washington Real Estate Board, an incorporated association of real estate brokers in Washington, D. C.; and 15 of its members individually and as representatives of a class consisting of all members of the Washington Board.

[2] "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal."

[3] The indictment was returned against the Washington Real Estate Board and the National Association of Real Estate Boards.

[4] An appeal from that order was dismissed. 85 U. S. App. D. C. 165, 176 F. 2d 631.

The civil case was then tried. It was stipulated that the trial would be on the record in the criminal case, the United States reserving the right to offer additional exhibits. No evidence was offered by appellees. The court entered judgment for the appellees, holding that the agreement to fix the rates of brokerage commissions, which had been shown, was not a violation of the Act. 84 F. Supp. 802. The case is here on appeal. 32 Stat. 823, 62 Stat. 989, 15 U. S. C. § 29.

*First.* The fact that no interstate commerce is involved is not a barrier to this suit. Section 3 of the Sherman Act[5] is not leveled at interstate activities alone. It also puts beyond the pale certain conduct purely local in character and confined to the District of Columbia. That Congress has the power so to legislate for the District by virtue of Art. I, § 8, Clause 17 of the Constitution and did so by § 3 was settled by *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 432–435.

*Second.* The Washington Board has adopted standard rates of commissions for its members—charges which cover the wide range of services furnished by a real estate agent. The Board's code of ethics provides that "Brokers should maintain the standard rates of commission adopted by the board and no business should be solicited at lower rates." Members agree to abide by this code. The prescribed rates are used in the great majority of transactions, although in exceptional situations a lower charge is made. But departure from the prescribed rates has not caused the Washington Board to invoke any sanctions. Hence the District Court called the rate schedules "non-mandatory."

Enough has been said to show that under our decisions an illegal price-fixing scheme has been proved, unless the

---

[5] See note 2, *supra.*

fixing of real estate commissions is not included in the prohibitions of § 3 of the Act. Price-fixing is *per se* an unreasonable restraint of trade. It is not for the courts to determine whether in particular settings price-fixing serves an honorable or worthy end. An agreement, shown either by adherence to a price schedule or by proof of consensual action fixing the uniform or minimum price, is itself illegal under the Sherman Act, no matter what end it was designed to serve. That is the teaching of an unbroken line of decisions. See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 218 *et seq.; United States* v. *Paramount Pictures,* 334 U. S. 131, 142, 143. And the fact that no penalties are imposed for deviations from the price schedules is not material. See *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600, 608–609; *American Column Co.* v. *United States,* 257 U. S. 377, 411; *Federal Trade Commission* v. *Pacific Paper Assn.,* 273 U. S. 52, 62. Subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line.

*Third.* The critical question is whether the business of a real estate agent is included in the word "trade" within the meaning of § 3 of the Act. The District Court, thought not. It was of the view that where personal services are involved, a combination to fix the price or compensation is legal. It seemingly was influenced by the declaration in § 6 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 17, that "the labor of a human being is not a commodity or article of commerce . . . nor shall such [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." But we think it a misconception to assimilate the services involved here to those of employees or to compare the present case to those involving the application of the

antitrust laws to labor unions. Cf. *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469; *United States* v. *Hutcheson,* 312 U. S. 219. We do not have here any more than we did in *American Medical Assn.* v. *United States,* 317 U. S. 519, or *United States* v. *Women's Sportswear Mfrs. Assn.,* 336 U. S. 460, cf. *Columbia River Packers Assn.* v. *Hinton,* 315 U. S. 143, an aspect of the employee-employer relationship to which the antitrust laws have made special concessions.

Members of the Washington Board are entrepreneurs. Some are individual proprietors; others are banks or corporations. Some may have no employees; others have large staffs. But each is in business on his own. The fact that the business involves the sale of personal services rather than commodities does not take it out of the category of "trade" within the meaning of § 3 of the Act. The Act was aimed at combinations organized and directed to control of the market by suppression of competition "in the marketing of goods and services." See *Apex Hosiery Co.* v. *Leader, supra,* p. 493.

Justice Story in *The Nymph,* 18 Fed. Cas. 506, while construing the word "trade" in the Coasting and Fishery Act of 1793, 1 Stat. 305, said,

> "The argument for the claimant insists, that 'trade' is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word 'trade' is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions,

> it is constantly called a trade. Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoemaker, though some of these may be, and sometimes are, carried on without buying or selling goods."

It is in that broad sense that "trade" is used in the Sherman Act. That has been the consistent holding of the decisions. The fixing of prices and other unreasonable restraints have been consistently condemned in case of services as well as goods. Transportation services (*United States* v. *Freight Assn.*, 166 U. S. 290, 312; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505), cleaning, dyeing, and renovating wearing apparel (*Atlantic Cleaners & Dyers* v. *United States*, 286 U. S. 427), the procurement of medical and hospital services (*American Medical Assn.* v. *United States, supra,* 528), the furnishing of news or advertising services (*Farmer's Guide Co.* v. *Prairie Co.*, 293 U. S. 268; *Associated Press* v. *United States,* 326 U. S. 1)—these indicate the range of business activities that have been held to be covered by the Act. In *Atlantic Cleaners & Dyers* v. *United States, supra,* 435, 437, the Court rejected the view that "trade" as used in § 3 should be interpreted in the narrow sense which would exclude personal services. It held, speaking through Mr. Justice Sutherland, that § 3 used the word in the broad sense in which Justice Story used it in *The Nymph, supra.* Chief Justice Groner made an extended analysis and summary of the problem in *United States* v. *American Medical Assn.,* 72 App. D. C. 12, 16–20, 110 F. 2d 703, 707–711, where the Court of Appeals for the District of Columbia held that the practice of medicine in the District was a "trade" within the meaning of § 3 of the Act. Its conclusion was that the term included "all occupations in which men are engaged for a livelihood." We do

not intimate an opinion on the correctness of the application of the term to the professions. We have said enough to indicate we would be contracting the scope of the concept of "trade," as used in the phrase "restraint of trade," in a precedent-breaking manner if we carved out an exemption for real estate brokers. Their activity is commercial and carried on for profit. The fact that no goods are manufactured or bought or sold in the process is as irrelevant here as it was in *Atlantic Cleaners & Dyers* v. *United States, supra.* No reason of policy has been advanced for reading § 3 of the Act less literally than its terms suggest. The competitive standards which the Act sought to preserve in the field of trade and commerce seem as relevant to the brokerage business as to other branches of commercial activity.

*Hopkins* v. *United States,* 171 U. S. 578, and *Anderson* v. *United States,* 171 U. S. 604, are not opposed to this conclusion. It was held in those cases that commission merchants and yard traders on livestock exchanges were not engaged in interstate commerce even though the livestock moved across state lines (cf. *Stafford* v. *Wallace,* 258 U. S. 495), and therefore that the rules and agreements between the merchants and traders (which included in the *Hopkins* case the fixing of minimum fees) did not fall under the ban of the Sherman Act. But we are not confronted with that problem here. As noted, we are concerned here not with interstate commerce but with trade or commerce in the District of Columbia.

*Fourth.* Appellees claim that the judgment of acquittal in the criminal action is *res judicata* in this action. *Helvering* v. *Mitchell,* 303 U. S. 391, is *contra* and rules this case. There Mitchell had been tried and acquitted of a criminal charge of wilfully attempting to evade payment of his income tax. Thereafter suit was brought to

collect the taxes owed plus a 50 per cent penalty for fraudulent evasion. The acquittal in the criminal case was held not to be a bar to the collection of the penalty.[6] "The difference in degree of the burden of proof in criminal and civil cases" was held to preclude application of the doctrine of *res judicata* in the civil suit. 303 U. S. 397. In the present case the motions for judgment of acquittal raised the question whether the evidence overcame all reasonable doubt of the guilt of appellees.[7] The ruling on them did not determine whether by the lesser degree of proof required in a civil case appellees might be found to have conspired to fix commissions. The civil action is independent of the criminal cause (*Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 52) and is remedial in nature. It has been repeatedly held that though the civil suit is bottomed on the same facts, it is

---

[6] Since the Court ruled that the 50 per cent penalty was not a criminal penalty but a civil administrative sanction (303 U. S. 398–406), the case was considered distinct from *Coffey* v. *United States,* 116 U. S. 436, which held that the facts ascertained in a criminal case as between the United States and the claimant could not be again litigated between them in a civil suit which was punitive in character. The fact that in case of corporations dissolution can result from a civil suit under the antitrust laws does not make the proceeding any the less remedial. The civil suit aims to put an end to the restraint, not to impose punishment for past acts. See *Schine Theatres* v. *United States,* 334 U. S. 110, 128.

[7] The motions apparently were made under Rule 29 of the Federal Rules of Criminal Procedure which provides in part: "MOTION FOR JUDGMENT OF ACQUITTAL. Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

not barred by the prior judgment of acquittal in the criminal case. See *Stone* v. *United States,* 167 U. S. 178; *Murphy* v. *United States,* 272 U. S. 630; *Helvering* v. *Mitchell, supra.* The result is not altered by the circumstance that the court in ruling on the sufficiency of the evidence may have started with an erroneous construction of the law.

*Fifth.* The District Court found that two of the appellees—National Association and Herbert U. Nelson [8]—did not conspire with the Washington Board to fix and prescribe the rates of commission to be charged by the members of the latter. No more particularized findings were made. Appellant asks us to set aside that ruling. The question is whether we may do so in light of Rule 52 of the Federal Rules of Civil Procedure which provides in part:

> "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The National Association is a nationwide, incorporated trade association of which the Washington Board is a member. Active members of the Washington Board are also members of the National Association. The National Association has a code of ethics which includes an article stating that "the schedules of fees established by the various Real Estate Boards are believed to represent fair compensation for services rendered in their communities and should be observed by every Realtor." It is provided in the by-laws of the National Association (1) that each member board shall adopt the code of ethics of the National Association as a part of its rules and regulations for violation of which disciplinary action may

---

[8] See note 1, *supra.*

be taken, and (2) that any member board that neglects or refuses to maintain and enforce the code of ethics with respect to the activities of its constituent members may be expelled from membership in the National Association. The appellant also points to evidence showing the activities of the National Association in developing a national schedule of commissions which, it is alleged, were influential in shaping the fees adopted by the Washington Board in 1944.

Appellant relies chiefly on the code of ethics, and by-laws of the National Association, as it clearly may (*Associated Press* v. *United States, supra,* pp. 8, 12), to establish the restraint of trade. But we cannot say that the District Court was "clearly erroneous" in finding that the National Association and Nelson were not laced into the conspiracy to fix the commissions in the District of Columbia. The statement in the code of ethics that the schedule of fees "should be observed" is somewhat ambiguous. It may be advisory only. The provision of the by-laws that violations of the code of ethics of the National Association should be the basis of disciplinary action against both member boards and their constituent members is aimed at thirty-five articles of the code of ethics, not selectively at the fee provision. So we are left somewhat in doubt as to the extent if any to which the National Association and Nelson were architects of the fee-fixing conspiracy or participants in it. At best their relationship to it is, on this record, a somewhat attenuated one.

It is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent. See *United States* v. *Yellow Cab Co.*, 338 U. S. 338, 342; *United States* v. *Gypsum Co.*, 333 U. S. 364, 394–395. We are not given those

choices, because our mandate is not to set aside findings of fact "unless clearly erroneous."

The judgment of the District Court is reversed except as to the National Association and Nelson; and as to them it is affirmed.

*So ordered.*

MR. JUSTICE FRANKFURTER and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON, dissenting.

If real estate brokerage is to be distinguished from the professions or from other labor that is permitted to organize, the Court does not impart any standards for so doing.

It is certain that those rendering many kinds of service are allowed to combine and fix uniform rates of pay and conditions of service. This is true of all laborers, who may do so within or without unions and whose unions frequently do include owners of establishments that employ others, such as automobile sales agencies. See, for example, *International Brotherhood of Teamsters, etc.* v. *Hanke, ante,* p. 470. I suppose this immunity is not confined to those whose labor is manual, and is not lost because the labor performed is professional. The brokerage which is swept under the antitrust laws by this decision is perhaps a borderline activity. However, the broker furnishes no goods and performs only personal services. Capital assets play no greater part in his service than in that of the lawyer, doctor or office worker. Services of the real estate broker, if not strictly fiduciary, are at least those of a trusted agent and, oftentimes, advisory as to values and procedures. I am not persuaded that fixing uniform fees for the broker's labor is more offensive to the antitrust laws than fixing uniform fees for the labor of a lawyer, a doctor, a carpenter, or a plumber. I would affirm the decision of the court below.