Wilma **CUMPIANO** a/k/a Wilma Cumpiano Sanchez, Plaintiff, Appellee,

v.

**BANCO SANTANDER PUERTO RICO,** Defendant, Appellant.

No. 89–2097.

United States Court of Appeals, First Circuit.

May 4, 1990.

Jay A. Garcia Gregory, with whom Ricardo F. Casellas, Emily Arean–Diaz, and Fiddler Gonzalez & Rodriguez, San Juan, P.R., were on brief, for defendant, appellant.

A. Santiago–Villalonga with whom Nachman & Fernandez–Sein, Santurce, P.R., was on brief, for plaintiff, appellee.

Before BREYER and SELYA, Circuit Judges, and RE,* Judge.

SELYA, Circuit Judge.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17 (Title VII), is the mainstay of the reticulation of laws which Congress enacted to end discrimination in the workplace. Concerned that Title VII's reach was too narrowly phrased, Congress later amended the statute to make manifest that discrimination "because of sex" or "on the basis of sex" included discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." Pub.L. 95–555, § 1, 92 Stat. 2076 (Oct. 31, 1978), codified at 42 U.S.C. § 2000e(k) (1982). Invoking these amendments, plaintiff-appellee Wilma Cumpiano Sanchez (Cumpiano), who claimed to have been fired because of her pregnancy, sued her former employer, defendant-appellant Banco Santander Puerto Rico (the Bank), in federal district court. Following a bench trial, the district judge ruled in Cumpiano's favor. *Cumpiano v. Banco Santander*, No. 87–0873, slip op. (D.P.R. Oct. 31, 1989) (hereinafter "D. Ct. Op."). The Bank appeals.

I. CHRONOLOGY OF EVENTS

We present the facts in the light most hospitable to the verdict-winner, consistent with record support. The Bank hired Cumpiano in 1978. In due time, she came in contact with, and worked under the supervision of, Humberto Rodriguez Calderon (Rodriguez), the Bank's assistant comptroller. In 1980, Cumpiano and Rodriguez became enmeshed in an amorous relationship. Although Rodriguez was married, the record reflects that the affair was conducted in a public and notorious fashion. In 1982, a child was born to the couple out of wedlock. The Bank clearly knew of the affair and of its consequences; indeed, Rodriguez presented a copy of the infant's birth certificate to appellant's human resources director, Arturo Thurin, and secured coverage for his offspring under an employer-paid health insurance policy. The lovers stayed on the payroll after the baby was born. Plaintiff was not reprimanded, admonished, or cautioned in any way. And the affair continued "openly." D.Ct.Op. at 2.

Although appellant denies that it was aware of the romance's prolongation, the evidence amply sustains the opposite inference. To cite one example, there was proof, credited by the court below, that at an office softball tournament in 1983, Rodriguez's adult son (who also worked for the Bank) argued publicly with his father about Cumpiano's presence. Several officials of the Bank, including its assistant personnel officer, witnessed this episode and overheard the discussion. Thurin was told about it shortly thereafter. So was the Bank's senior vice president.

Cumpiano had various assignments over the years. After 1982, she and Rodriguez worked in different departments. They still spent time together out of the office. Parturiency again resulted. In December 1986, following a brief vacation, Cumpiano returned to work dressed in maternity clothes and visibly pregnant. She was handed a letter promoting her, on an interim basis, to operations officer (a position in which she directly supervised 7 to 9 employees at the Bank's San Juan branch). Weeks later, the axe fell. Thurin fired both Rodriguez and Cumpiano on January 29, 1987. Cumpiano received no notice, but Thurin offered her $5,000 in exchange for a letter of resignation and a general release. When Cumpiano asked for an explanation of her dismissal, Thurin refused to give her any reason, saying only that he did not wish to discuss things she already knew.

At trial, appellant claimed that Cumpiano was dismissed because her conduct violated the Bank's internal regulations. Specifically, appellant protested that plaintiff's affair with a married man made her guilty of the crime of adultery under Puerto Rico law and was therefore violative of Norm 14

* The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

of the Bank's Manual of General Norms of Work and Conduct (Manual).[1] Plaintiff asserted that the stated reason was pretextual. After evaluating the evidence the district court found in Cumpiano's favor, reinstating her and awarding backpay, compensatory damages, counsel fees, and costs.

## II. STANDARD OF REVIEW

■ While we review errors of law occurring in the course of a bench trial de novo, *Reliance Steel Products Co. v. National Fire Ins. Co.*, 880 F.2d 575, 577 (1st Cir.1989), our review of factual determinations is much more circumscribed. The Civil Rules illumine the course we must steer:

In all actions tried upon the facts without a jury.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

Fed.R.Civ.P. 52(a). The trial judge sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way which appellate courts cannot hope to replicate. Recognizing the superiority of this bird's-eye view, Rule 52(a) commands, and our precedents ordain, that deference be paid to the trier's assessment of the evidence. *See, e.g., Jackson v. Harvard Univ.*, 900 F.2d 464, 466 (1st Cir.1990); *Reliance Steel*, 880 F.2d at 576; *Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1019 (1st Cir.1988); *Irons v. FBI*, 811 F.2d 681, 684 (1st Cir.1987); *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 71 (1st Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

It follows inexorably that, in a jury-waived case, appellate courts cannot presume to decide factual issues anew. *Reliance Steel*, 880 F.2d at 576; *Keyes*, 853 F.2d at 1019. Rather:

If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *accord Jackson*, 900 F.2d at 466, 467–68; *Keyes*, 853 F.2d at 1019–20. Thus, we ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made. *See Reliance Steel*, 880 F.2d at 576; *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 203 (1st Cir.1987); *see also United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Findings concerning an actor's intent fit neatly within the integument of the "clearly erroneous" rule. *See Anderson*, 470 U.S. at 566, 105 S.Ct. at 1508; *United States v. National Assoc. of Real Estate Boards*, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950); *Keyes*, 853 F.2d at 1019.

## III. INDIRECT PROOF OF DISCRIMINATION

■ Title VII makes it unlawful for an employer, inter alia, "to discharge any indi-

---

**1.** The Manual was issued in Spanish. Appellant has failed to furnish us with a translated copy. We rely, therefore, on the district court's summarization:

Norm # 14 requires bank employees to "maintain at all times conduct characterized by decency and public morality." It defines the type of fault which is proscribed to be "conviction of a crime that involves moral depravity, or that involves conduct which in the bank's judgment disqualifies the employee from continuing performance at his/her post".

D.Ct.Op. at 3–4. Thurin's description of Norm 14 at trial was in much the same vein:

Q What is the norm, and what is considered the fault, the violation of that norm?

A To be convicted of felony or misdemeanor involving moral depravity, or that involves behavior that in the opinion of the bank, disqualifies him or her to continue performing the duties of the position he or she occupies.

vidual ... because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1) (1982). The inquiry in a Title VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff on the basis of a protected attribute. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Keyes*, 853 F.2d at 1023; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 106 (1st Cir.1988). Since 1978, gravidity has been so "protected," that is, the ban on gender-based discrimination has applied explicitly to discrimination "on the basis of pregnancy." 42 U.S.C. § 2000e(k) (1982).

■ Under Title VII, the plaintiff has the burden of proving that the defendant discriminated against her for a proscribed reason. In doing so, the plaintiff "does not have to present direct proof of discriminatory motive in order to prevail." *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir.1989). Absent direct evidence, a plaintiff will usually proceed in terms of the burden-shifting framework formulated by the Supreme Court. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–96, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). As adapted to employment termination, we interpret the *Burdine* model to provide that a prima facie case may be established by showing that: (1) the plaintiff was within a protected class; (2) she was qualified for, and adequately performed, her job; (3) she was nevertheless dismissed; and (4) after her departure, the employer sought someone of roughly equivalent qualifications to perform substantially the same work. *See Lipsett v. University of Puerto Rico*, 864 F.2d 881, 899 (1st Cir.1988); *Blizard v. Fielding*, 572 F.2d 13, 15 (1st Cir.1978); *see also Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7 (1st Cir.1990) (ADEA).

■ Once established, the prima facie case serves only to shift the burden of production to the employer, leaving the burden of persuasion intact. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95; *Keyes*, 853 F.2d at 1023. The employer can satisfy its burden of production by articulating—not necessarily proving—some legitimate, nondiscriminatory reason that justifies the firing. *Lipsett*, 864 F.2d at 899; *Johnson*, 731 F.2d at 70. "So long as the employer proffers such a reason, the inference raised by plaintiff's prima facie case vanishes." *Medina–Munoz*, 896 F.2d at 7. The complainant must then carry her burden of proof by demonstrating that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

## IV. LIABILITY

Appellant offers a grab bag of reasons why the district court's liability finding cannot stand. Inasmuch as the stated reasons overlap, we have sorted them out and arranged them along a makeshift continuum. To the extent that certain components of the asseverational array are not mentioned, it is because we deem them patently infirm.

### A. *Legal Error.*

■ It is settled that one way around the rigors of the "clearly erroneous" rule is to show that the trial court mistook the applicable law. *See United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963); *Reliance Steel*, 880 F.2d at 577; *RCI Northeast*, 822 F.2d at 203. Attempting to reach the attractive waters of this safe harbor, appellant asserts that the district judge wrongly required it to prove that it had not dismissed Cumpiano because of her pregnancy. The claim is specious.

The opinion below makes it plain that the lower court understood, and applied, the burden-shifting framework and rested the devoir of persuasion where it belonged: on Cumpiano's shoulders. *See, e.g.,* D.Ct.Op. at 6 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095); *id.* at 7 (district court rejects defendant's proffered explanation because, more likely than not, it is pretextual). On this record, it is perfectly clear

that appellant's burden-of-proof argument is a Trojan horse. Stripped of camouflage, the Bank's complaint is not that the judge misapprehended the burden of proof but that he reached the wrong conclusion. That complaint falls into the maw of Rule 52(a). As we recently wrote:

> The "clearly erroneous" rule cannot be evaded by the simple expedient of creative relabelling. To paraphrase Gertrude Stein: facts are facts are facts. And, we will not permit parties to profit by dressing factual disputes in "legal" costumery.

*Reliance Steel,* 880 F.2d at 577.

## B. *The Prima Facie Case.*

Appellant next contends that plaintiff should not have prevailed because her prima facie case was doubly deficient: first, while Cumpiano may have been technically qualified for her job, she nevertheless failed to meet the Bank's legitimate expectation that she would conduct herself in a manner "characterized by decency and public morality" as required by Norm 14; and second, appellee failed to prove that she was supplanted by a nonpregnant person. We think that these arguments exhibit a fundamental misunderstanding of the nature and uses of the burden-shifting framework.

■ 1. *Job Qualifications.* There is copious evidence in the record tending to prove that Cumpiano, prior to her dismissal, was considered to be a first-rate employee. For nine years, her performance was generally lauded by the employer. She had been romantically involved with Rodriguez for the last seven of those years. Throughout that period, the Bank implicitly condoned the affair, giving Cumpiano no indication that she was in violation of an internal regulation or that her liaison impeded her effectiveness in the workplace. Immediately before the Bank learned of her 1986 pregnancy, she received an important promotion. The Bank concedes that her handling of enhanced responsibility as an operations officer during the ensuing five or six weeks was commendable. Noth-

ing happened during that interval to make her a less desirable or efficient employee.

The issue of job qualifications must be viewed in an objectively reasonable way. Particularly in a discharge case—where an employee has been doing the job satisfactorily for a substantial period of time—the proponent's burden is not great. Conversely, an employer's *post hoc* rationalizations cannot be allowed to overshadow the reality of events. In this instance, taking the full panoply of circumstances in a light favorable to plaintiff, and drawing reasonable inferences therefrom, Cumpiano's burden was fulfilled. The trier was entitled to conclude from plaintiff's work record, from the Bank's reaction over time to the love affair, and from the lack of any warning that the romance was impeding her work effectiveness, that plaintiff's job performance met her employer's legitimate expectations. *Compare, e.g., Townsend v. Gray Line Bus Co.,* 767 F.2d 11, 20 (1st Cir. 1985). There was "evidence which, if believed, proved that [s]he was doing [her] chores proficiently." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1335 (1st Cir.1988).

■ 2. *Identity of Plaintiff's Replacement.* In respect to the second half of defendant's attack upon the prima facie case, we agree that the evidence was inconclusive as to whether Cumpiano was replaced by a nonpregnant person. That uncertainty, however, was not fatal to Cumpiano's quest, for she could satisfy the "fourth prong" of her prima facie case simply by showing that a replacement was sought. We explain briefly.

The prima facie case method conceived in *McDonnell Douglas* and nurtured in *Burdine* was "never intended to be rigid, mechanized, or ritualistic." *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949. The seminal case—a refusal-to-hire case—required, on the fourth prong, that after a firm had rejected a job seeker "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). The Court cautioned that "[t]he facts nec-

essarily will vary in Title VII cases, and the specification ... of the prima facie proof ... is not necessarily applicable in every respect to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13; *see also Loeb v. Textron, Inc.*, 600 F.2d 1003, 1016–17 (1st Cir.1979) (*McDonnell Douglas* formulation "should not be used inflexibly as a vehicle for organizing evidence or presenting a case"). While we have sometimes suggested in hiring cases that an unsuccessful applicant should show that the open position was filled by someone from outside the protected group, *see, e.g., Keyes*, 853 F.2d at 1023,[2] we have never held that the fourth element of a prima facie discharge case can be fulfilled only if the complainant shows that she was replaced by someone outside the protected group. Indeed, we have said precisely the opposite. *See Freeman*, 865 F.2d at 1335 n. 2 ("replacement by a younger person ... is not an element of the plaintiff's prima facie case in an ADEA suit"); *Loeb*, 600 F.2d at 1012–13 (same).

Today we set any uncertainty to rest and rule that, in a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was filled by a person not possessing the protected attribute. *Accord Walker v. St. Anthony's Medical Center*, 881 F.2d 554, 558 (8th Cir.1989). Put another way, while the attributes of a successor employee may have evidentiary force in a particular case, *see Freeman*, 865 F.2d at 1335 n. 2; *Giannotti v. Foundry Cafe*, 582 F.Supp. 503, 506 (D.Conn. 1984), a complainant can satisfy the fourth prong of her prima case simply by showing that, as here, the employer had a continued need for "someone to perform the same work after [the complainant] left." *Lipsett*, 864 F.2d at 899.

3. *Some General Observations.* Before leaving the prima facie case, we remark the essential pointlessness of arguments such as those discussed above.

Courts and litigants must bear in mind that the critical determination in any Title VII suit is whether the complainant has proven by a fair preponderance of the evidence that an impermissible consideration—say, her gender—was a substantial motivating factor in the adverse employment decision. That principle requires the trial court at case's end, as well as a reviewing court, to focus not on the artificial striations of the burden-shifting framework, but on "the district court's ultimate finding of discrimination *vel non.*" *Jackson*, 900 F.2d at 466; *see also Dance v. Ripley*, 776 F.2d 370, 373 (1st Cir.1985); *Johnson*, 731 F.2d at 70. Courts should not unduly complicate this important inquiry "by applying legal rules which were devised to govern 'the basic allocation of burdens and order of proof' in deciding this ultimate question." *United States Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093). Where, as in this case, the employer has come forward with its explanation, that is:

> Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff."

*Id.* at 715, 103 S.Ct. at 1482 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093).

### C. Treatment of Other Pregnant Employees.

Appellant also accuses the district court of committing reversible error in "refusing to consider" evidence that other employees who became pregnant in 1986–1987 were not dismissed. Appellant's Brief at 42. The charge flies well wide of the mark.

First, we set the record straight. Contrary to the intimations contained in appellant's brief, the district court did not ex-

---

**2.** In *Keyes,* the unsuccessful applicant was a black woman and the office to which she aspired was eventually filled by a white male. 853 F.2d at 1023. Those facts were undisputed. Our comment as to what Keyes needed to show in that respect was, therefore, dicta.

clude the evidence (a maternity register) but received it as a full exhibit. Thus, when appellant polemicizes the district court for "refusing to consider" the evidence, it is really attempting to read the judge's mind and fault him for not attaching decretory significance to the register. We believe the criticism to be misplaced.

It is well established under Title VII that claims of employment discrimination may arise in two different ways. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). A "disparate treatment" claim arises when an employer treats an employee less favorably than others because of her race, color, religion, sex, or national origin. *Id.* On the other hand, "disparate impact" claims stem from employment practices, often facially neutral, which (1) cannot be justified by business necessity and (2) in fact impose harsher burdens on employees who share a protected characteristic. *Id.* In the latter type of case, statistical evidence may be highly relevant to a determination of the employer's motive. *See Furnco*, 438 U.S. at 580, 98 S.Ct. at 2951; *Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856. In a disparate treatment case, however, the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why. In that regard, statistical comparisons, although often relevant, are obviously less crucial. Were the rule otherwise, the employer's first bite at the apple would be for free: if the firm had never before discriminated on the basis of gender, it could with impunity discharge one woman.

To a large extent, statistics signify what the factfinder reasonably believes that they signify. "The probative worth of statistical testimony must be evaluated in light of the methodology employed, the data available, and the factual mosaic unique to the case at hand." *Freeman*, 865 F.2d at 1342

n. 5; *see also Teamsters*, 431 U.S. at 340, 97 S.Ct. at 1857. The data which appellant produced was far from compelling. The register showed that, during a two year period, approximately 19 female employees took maternity leave and subsequently returned to work at the Bank. For purposes of the instant case, the information might be suggestive or it might be meaningless; the weight to be given to the statistics was for the factfinder. The district court was in the best position to assess the data's bearing, if any, on the Bank's treatment of Cumpiano. While the judge, if he saw fit, might have relied on the register, he elected to treat it as unmeaningful.[3] We refuse to second-guess the trier's "choice of which competing inferences to draw" from the facts of record. *Irons v. Federal Bureau of Investigation*, 811 F.2d 681, 684 (1 Cir. 1987). The court's failure to place decisive weight on the evidence cannot be characterized as clearly erroneous.

### D. *The Harassment Defense.*

Appellant argues that it must have had the right to cashier Cumpiano because the trysters' relationship, if ignored by the Bank, could have become the basis of a sexual harassment suit under both federal law (citing Title VII) and local law (citing 29 P.R. Laws Ann. § 155G). In essence, the Bank contends that, since Cumpiano was on a lower rung of the management ladder than Rodriguez, she could have successfully prosecuted a claim of *quid pro quo* harassment. Alternatively, the Bank contends that other employees could have made such a claim because the affair's "pervasive" sexuality created a hostile workplace environment. So, the thesis runs, the Bank was forced to take disciplinary action against Cumpiano and Rodriguez in order to avoid liability arising out of their affair. We regard the argument as fallacious and believe that the trial judge acted well within his discretion in rejecting it.

---

**3.** It is immaterial that the judge did not mention the maternity register in his rescript. "In a bench trial where the judge makes reasonably detailed findings of fact on the pertinent issues, he need not specifically enumerate and reject all

of the data he considers inadequate, irrelevant, unreliable, unimportant, or nondispositive." *Rivera-Gomez v. de Castro*, 900 F.2d 1, 4 (1st Cir.1990).

In the first place, the court was entitled to deem the alleged fear of sexual harassment suits to be bogus. After all, the Bank was apparently content to let the relationship continue, publicly and openly, for several years, although Title VII was firmly in place. Defendant's local law claim is even weaker; the statute which defendant cites, 29 P.R. Laws Ann. § 155G, was not enacted until April 22, 1988 (over 15 months after Cumpiano was fired). Secondly, Thurin never said that the reason the Bank discharged the plaintiff was because it feared sexual harassment claims or because plaintiff, as a managerial employee, was insensitive to the Bank's policy in that respect. Nor can defendant credibly claim that it was blocked from adducing such evidence. Although the district court rejected the Bank's attempt to introduce its formal sexual harassment policy into evidence, the court allowed Thurin to testify fully as to his alleged reasons for firing Cumpiano.[4]

The sockdolager is this: any supposed concern about potential sexual harassment claims, whether on behalf of Cumpiano herself or some hypothetical third party, vanished once the Bank terminated Rodriguez. Since only Rodriguez, as Cumpiano's superior, was in a position to harass, *cf. Meritor Savings Bank v. Vinson*, 477 U.S. 57, 73, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (plaintiff stated valid claim for sexual harassment against employer following four year relationship with supervisor), his removal effectively nullified the possibility of any future sexual harassment claim on Cumpiano's part; and since both actors were indispensable to maintain an atmosphere of pervasive sexuality, *cf.* X. Cugat ("It Takes Two To Tango"), Rodriguez's dismissal also nullified the possibility of future third-party hostile environment claims. Accordingly, there was no conceivable point in firing Cumpiano to ensure this end.

In fine, the harassment "issue" was a red herring.

### E. Weight of the Evidence.

 We come now to the crossroads at which all of defendant's arguments converge. The Bank claims that the district court's findings on liability were against the great weight of the evidence, ergo, clearly erroneous. We do not agree.

The key finding, of course, was that defendant intentionally discriminated against Cumpiano because of her pregnancy. Having carefully canvassed the record, we believe the finding was sustainable. "[T]o prevail [on the] contention that the district court drew the wrong conclusion from the evidence before it, appellant must show that the district court's conclusions had no reasonable support." *Manning v. Trustees of Tufts College*, 613 F.2d 1200, 1203 (1st Cir.1980). This is a difficult obstacle to surmount—and the Bank, on the current set of facts, cannot scale the heights.

The record permits a finding that Cumpiano and Rodriguez had been engaged in a longstanding affair of which management had full awareness. Norm 14 was on the books throughout this period, but appellant chose not to explore its use. Far from expressing disapproval regarding Cumpiano's behavior, the Bank instead rewarded her by placing her in positions of increased responsibility. It was not until early 1987, when Cumpiano was obviously pregnant, that the Bank ousted her. Nor was the explanation which appellant offered at trial convincing. Indeed, it seems triply flawed:

1. The judge did not believe that Norm 14 by its terms provided adequate justifica-

---

**4.** Defendant cannot profitably contend that it took the court's rejection of the policy statement as an exclusion of any and all testimony anent sexual harassment, including further questioning of Thurin. After all, defendant made no offer of proof that the policy's introduction was a necessary predicate to testimony that the firing was motivated in part by the threat of sexual harassment claims; nor did it offer to prove what Thurin's testimony would have been in regard thereto. Consequently, defendant has forfeited the chance to raise the matter on appeal. *See Earle v. Benoit*, 850 F.2d 836, 847 (1st Cir.1988); *FDIC v. Consolidated Mortgage and Fin. Corp.*, 805 F.2d 14, 16 (1st Cir.1986); *see also* Fed.R.Evid. 103(a)(2) (error may not be predicated on a ruling excluding evidence unless "the substance of the evidence was made known to the [trial] court" or was otherwise apparent).

tion for the firing. In his view, Norm 14 "require[d] *conviction* of a crime in order to apply." D.Ct.Op. at 6 (emphasis in original). From what we can tell, *see supra* note 1, that seems a fair reading of an ambiguous regulation. Yet, plaintiff was fired although she had never been charged with, much less convicted of, adultery or any other crime.

2. Management knew for more than five years that Norm 14, if it applied, was being flouted. The district court found, and the record does not contradict, that Norm 14 mandated the *immediate* dismissal of the offending employee. *Id.* at 4. Still, as the court observed, no steps were taken "to enforce the rules until plaintiff became pregnant." *Id.* at 7. Appellant's profession of a sudden concern for public morals after so long a period of acquiescence was, to say the least, suspicious.

3. Most notably, apart from the Bank's knowledge of plaintiff's pregnancy, nothing changed between the date plaintiff was promoted to operations officer and the date she was terminated.

Mindful of these flaws, we think that the district court could rationally have concluded that the reasons offered to justify Cumpiano's dismissal "were not [the employer's] true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Once so glaring a pretext was unmasked, an important underpinning to a finding of discrimination clicked into place. *See Freeman*, 865 F.2d at 1341–42; *cf. Medina–Munoz*, 896 F.2d at 10 (where employee's evidence of pretext is tenuous, more evidence of discriminatory animus may be required). And because, in this situation, the surrounding circumstances were likewise supportive of an inference of discrimination, the court could rationally have concluded that the Bank was willing to tolerate the meretricious relationship, but not the visible manifestation of it: Cumpiano's pregnancy.

We briefly address the attendant circumstances. The adulterous affair had flour-

ished openly and notoriously for many years. Despite the Bank's familiarity with the ongoing relationship, there was no evidence that any person in authority *ever* spoke to plaintiff about her love life, or suggested that she break off the liaison, until the day she was fired—shortly after her gravidity had become apparent. The judge noted specifically that, although Cumpiano inquired as to the grounds for dismissal, Thurin refused to invoke Norm 14 explicitly or give her any other reason. *See* D.Ct.Op. at 3. While an employer's refusal to explain an employee's discharge is not always probative of discriminatory intent, *see, e.g., Menard v. First Security Servs. Corp.*, 848 F.2d 281, 288 (1st Cir. 1988), "the context and circumstances" of the declination may render it probative. *Id.* This is such a case: given the utter absence of any credible reason for dismissing Cumpiano, the offer of a large amount of money "in exchange for her letter of resignation and a signed release from liability," D.Ct.Op. at 3, and Thurin's rather cryptic response to plaintiff's query (saying that he did not want to discuss things "she already knew"), we think the trial judge was entitled to regard Thurin's behavior as some evidence of the Bank's animus. *Cf., e.g., United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 55–56, 68 L.Ed. 221 (1929) (Brandeis, J.) ("Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character.").[5]

Appellant argues that, because of Thurin's direct denial of wrongful intent and the circumlocutory explanations which he voiced at trial, the district court should have forgone an inference of discriminatory animus. But, neither life nor litigation is so simplistic. It is a timeless verity that a trier of fact is not bound to accept the self-serving testimony of the protagonists in a case. *See, e.g., United States v. Jimenez–Perez*, 869 F.2d 9, 12 (1st Cir.1989). Whether or not to credit Thurin's testimo-

---

5. It is also possible, we think, that Thurin's words could have been taken as a reference to plaintiff's pregnancy—an interpretation even

more damning in these circumstances than an unadorned refusal to answer.

ny as to his knowledge and intent was predominantly a credibility question. Appellate courts should always be reluctant to erase the trial judge's answer to such a query. *See Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512 (plausible finding based on credibility "can virtually never be clear error"). In this instance, particularly, the judge was not bound, in light of the circumstantial evidence and the supportable inferences therefrom, to accept the witness' disclaimers.

To wax longiloquent would serve no useful purpose.[6] Admittedly, the case is close. We, if writing on a pristine page, might have been tempted to resolve the question the other way—yet, that is beside the point. *See Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511 (reviewing court cannot reverse findings of fact "simply because it is convinced that it would have decided the case differently"). Given the state of the proof, we cannot say the district court committed clear error in ruling that Cumpiano's dismissal resulted from her pregnancy. Here, as is so often true in appeals following bench trials, appellant's claim "reduces to the assertion that, had the facts been judged properly, [it] would have prevailed." *Jackson*, slip op. at 6. Unless the evidentiary scales are seriously miscalibrated, we must turn a deaf ear to such siren songs. Discerning no such imbalance, we let the liability finding stand. "Resolving which of the two disputants was entitled to prevail under applicable law in a close, fact-dominated case is precisely the sort of grist for which the trial mill was long ago devised." *Id.* at 14.

## V. DAMAGES

■ There is one final point which demands our attention. In addition to reinstatement, backpay, and other relief, the district court awarded plaintiff compensatory damages in the amount of $10,000.

That award must be reversed. It is clearly established in this circuit that "[c]ompensatory and punitive damages are not available to Title VII plaintiffs." *Rosario–Torres v. Hernandez–Colon*, 889 F.2d 314, 321 (1st Cir.1989) (en banc); *accord DeGrace v. Rumsfeld*, 614 F.2d 796, 808 (1st Cir.1980) (collecting cases).

The point requires no embroidery. Appellee acknowledged at oral argument that existing circuit precedent requires reversal of the compensatory damage award. She argued instead that we should change the rule. We decline her invitation.

## VI. CONCLUSION

We need go no further. For the reasons stated, we affirm the judgment below except as to the award of compensatory damages

*Affirmed in part; reversed in part. Two-thirds (⅔) costs to appellee.*

---

**6.** Appellant also stresses that Rodriguez, who was fired at the same time as Cumpiano, sued the Bank for age discrimination in a separate case. Rodriguez's suit was tried before a different judge. Cumpiano was not a party to it. Although the fact of Rodriguez's departure was relevant evidence, we think the court below was absolutely correct in declining to attach any

significance to the outcome of his civil action. *Cf. United States v. Powell*, 469 U.S. 57, 64–69, 105 S.Ct. 471, 476–79, 83 L.Ed.2d 461 (1984).

