# United States Court of Appeals
## For the First Circuit

No. 12-9002

IN RE: RALPH G. CANNING, III,
MEGAN L. CANNING, f/k/a MEGAN L. OTIS,
Debtors.

RALPH G. CANNING, III and
MEGAN L. CANNING, f/k/a MEGAN L. OTIS,
Plaintiffs, Appellants,

v.

BENEFICIAL MAINE, INC.; HSBC MORTGAGE SERVICES, INC.;
HSBC MORTGAGE CORPORATION,
Defendants, Appellees.

APPEAL FROM THE BANKRUPTCY
APPELLATE PANEL FOR THE FIRST CIRCUIT

Before

Torruella, Ripple,* and Howard,
Circuit Judges.

James F. Molleur, with whom Tanya Sambatakos, were on brief
for appellants.
Peter J. Haley, with whom Sean R. Higgins and Nelson Mullins
Riley & Scarborough LLP, were on brief for appellees.

February 1, 2013

---

* Of the Seventh Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**. Plaintiffs-Appellants, Ralph G. Canning III and Megan L. Canning (the "Cannings"), filed a Chapter 7 bankruptcy petition and sought to surrender their residence. When their mortgage lenders, Defendants-Appellees, Beneficial Maine, Inc., HSBC Mortgage Services, Inc., and HSBC Mortgage Corporation (collectively "Beneficial"), refused to foreclose or otherwise take title to the residence, the Cannings demanded that the mortgage lien be released.[1] Beneficial also refused to do so, and the Cannings began an adversary proceeding claiming a discharge injunction violation. On a stipulated record, the bankruptcy court found no discharge injunction violation in Beneficial's refusal to either foreclose or release the lien on the Cannings' residence. The Cannings appealed to the Bankruptcy Appellate Panel ("BAP"), with the same result. This second appeal followed, the parties reasserting the same arguments presented below. Finding no error in the holdings at issue, we affirm.

## I. Background

After an unsuccessful attempt to refinance the two-year old mortgage loan encumbering their residence, defaulting on the terms of said loan, and with foreclosure proceedings already underway in state court, the Cannings filed a Chapter 7 bankruptcy

---

[1] Because the loan documents are not part of the record, we cannot determine the exact role the foregoing entities played in the original loan transaction. Nevertheless, there is no dispute that the Cannings' mortgage belongs to those entities, which, hereafter, we refer to in the singular for convenience.

petition on March 5, 2009. According to their bankruptcy schedules, the mortgage loan had an outstanding balance of $186,521, while the residence had a market value of $130,000.[2] The schedules also indicated that the Cannings intended to surrender the residence.[3]

Early in the bankruptcy case, Beneficial voluntarily dismissed the state court foreclosure proceedings without prejudice "due to the [Cannings'] filing Chapter 7 bankruptcy." The Cannings received their bankruptcy discharge on June 3, 2009, and thus were released from their outstanding personal obligations on the mortgage loan. The exchange of correspondence underlying this appeal ensued two months thereafter.

Beneficial began the exchange with a letter informing the Cannings that it would "not initiate and/or complete foreclosure proceedings on [your residence]. You will retain ownership of the property" and "we will no longer advance any payments for taxes and insurances. You will be solely responsible for the payment of taxes, insurance, and maintenance of this property."[4]

---

[2]  The Cannings derived the market value of the residence from an informal appraisal obtained in mid-2008. As of the date of the bankruptcy petition, Beneficial valued the residence at $86,000.

[3]  On April 6, 2009, the Chapter 7 trustee filed a notice of abandonment of the residence.

[4]  The letter also stated that the Cannings still had "a financial obligation to repay [Beneficial] for the money borrowed. This financial obligation . . . remains intact . . . ." The bankruptcy court held that that portion of Beneficial's initial letter

In response, the Cannings reminded Beneficial of the bankruptcy discharge injunction and demanded that it either "(1) immediately commence foreclosure proceedings or (2) immediately discharge the mortgage on the property." With no answer from Beneficial, on October 1, 2009, the Cannings sent it another letter to follow up on their demand.

Beneficial responded by letter dated October 19, 2009. As relevant here, Beneficial's letter stated: "we are unable to honor your request to release the lien until the lien balance is satisfied in the amount of $186,324.15. However, we could consider a settlement option or a short sale." Beneficial also explained that the Cannings' account had been charged off, that they had no personal obligation to pay the lien balance, and that its letter was not an attempt to collect from them personally.

Despite this disclaimer from Beneficial, the Cannings interpreted the letter as a further violation of the discharge injunction. The next letter they sent to Beneficial emphatically indicated so and warned that a bankruptcy adversary proceeding would be filed if Beneficial failed to either foreclose or release its lien. But Beneficial did not budge, reiterating, instead, its prior response. The Cannings subsequently informed Beneficial that: (1) the residence had been vacated; (2) the utilities had

violated the discharge injunction and ordered Beneficial to pay $7,000 in sanctions. That order is not part of this appeal; therefore, we do not discuss it further.

been turned off; and (3) the municipal authorities, as well as the sewerage company, had been notified that Beneficial was the responsible party for any obligations pertaining to the residence.

True to their word, on December 21, 2009, the Cannings reopened their bankruptcy case and initiated an adversary proceeding against Beneficial. Among other things, they claimed actual and punitive damages in connection with Beneficial's "failure or refusal to commence foreclosure or otherwise recover possession of the [residence]." The Cannings also sought a declaratory judgment "ordering [Beneficial] to either recover possession of the Property or deliver unencumbered title to . . . the[m]." In its responsive pleading, Beneficial denied all material allegations and raised nine affirmative defenses, including lack of intent to violate the discharge injunction. At that time, Beneficial estimated the market value of the residence to be $75,000.

After preliminary procedural nuances, the parties agreed to submit the issue of liability on the basis of a jointly filed "Stipulation and Exhibits" containing the facts just described.[5] In their submission, the Cannings exclusively relied on our decision in Pratt v. General Motors Acceptance Corp. (In re Pratt), 462 F.3d 14 (1st Cir. 2006), where we held that a secured

---

[5] The parties agreed to reserve evidence and arguments regarding sanctions for a later hearing, which was to take place only if the Cannings prevailed on their contentions regarding liability.

creditor's refusal to foreclose or release its lien on an inoperable, worthless car was intended to objectively coerce the debtor into paying a discharged debt, in violation of the discharge injunction. According to the Cannings, "[t]he material facts . . . considered in Pratt mirror the facts in this case so closely, that they dictate the . . . determination that [Beneficial] acted in an objectively coercive manner." Beneficial disagreed, advancing purported fundamental factual differences between the Cannings' case and Pratt--mainly, that the Cannings' plight revolved around valuable real estate property while Pratt involved a worthless car.

The bankruptcy court ruled in favor of Beneficial. See Canning v. Beneficial Maine, Inc. (In re Canning), 442 B.R. 165 (Bankr. D. Me. 2011). In so doing, it first noted that "[t]he Cannings' demand of 'foreclose or release, now' ignore[d] the prospect that real estate values change (up, as well as down) over time" and that "[a] critical component of Pratt's holding was the collateral's worthlessness and the fact that, unlike real estate, 'vehicles rarely appreciate in value over time.'" Id. at 172. The court similarly observed that, "unlike the Pratts' secured creditor, [Beneficial] did not simply require that the Cannings 'pay in full.' Rather it responded by suggesting either a voluntary settlement or a 'short sale.'" Id. Such a proposal, the bankruptcy court reasoned, "plainly reveals that [Beneficial]

sought to collect no more than the value securing its lien." Id. As a postlude, the court then added:

> Of course, [Beneficial's] chosen course of action, or inaction, did not make things easy for the Cannings. Forces remained at work that could make their continued ownership of the real estate uncomfortable--forces like accruing real estate taxes and the desirability of maintaining liability insurance for the premises. But those forces are incidents of ownership. Though the Code provides debtors with a surrender option, it does not force creditors to assume ownership or take possession of collateral. And although the Code provides a discharge of personal liability for debt, it does not discharge the ongoing burdens of owning property.

Id.

The Cannings timely appealed to the BAP, where both parties reasserted their arguments under Pratt, and the BAP affirmed on the same reasoning. See Canning v. Beneficial Maine, Inc. (In re Canning), 462 B.R. 258 (B.A.P. 1st Cir. 2011). Like the bankruptcy court, the BAP found dispositive distinctions between the Cannings' case and Pratt, including that the Cannings' residence had significant value and that Beneficial had not simply required full payment on the loan to release its lien. Id. at 268. The BAP also noted that Pratt's holding had been supported in part by evidence of actual expenses arising from the continued ownership of the collateral at issue. Id. at 267. It then established that the Cannings had failed to introduce evidence of similar expenses and instead rested their case on the mere possibility that

liabilities could arise in the future.  Id.  Accordingly, "[b]ased upon the facts presented to and considered by the bankruptcy court," the BAP found itself unable to conclude "that there was a particular confluence of circumstances that renders Beneficial's refusal to discharge its mortgage tantamount to coercing the payment of a discharged prepetition debt."  Id. at 268.  This second appeal followed.

## II. Discussion

When an appeal comes to us by way of the BAP, we independently scrutinize the underlying bankruptcy court decision, reviewing factual findings for clear error and legal conclusions de novo.  Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997).  In reviewing for clear error, we "ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made."  Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990); see also In re Healthco Int'l, Inc., 132 F.3d at 108 ("This familiar standard is not diluted merely because parties proceed on a stipulated record.").  In contrast, "[u]nder the de novo standard of review, we do not defer to the lower court's ruling but freely consider the matter anew, as if no decision had been rendered below."  United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988).

In this case, the Cannings pose no challenge to the bankruptcy court's findings of fact, and we find that no mistake was made as to them.[6] The Cannings do, however, challenge the bankruptcy court's legal conclusions, reasserting their contention that the facts in this case mirror the ones in Pratt so closely that the same result should follow. Both the bankruptcy court and the BAP correctly rejected this argument in well-reasoned, thorough opinions. Our discussion here is therefore limited to the essentials. See Holders Capital Corp. v. Cal. Union Ins. Co (In re San Juan Dupont Plaza Hotel Fire Litig.), 989 F.2d 36, 38 (1st Cir. 1993) ("Where, as here, a trial court has produced a first-rate work product, a reviewing tribunal should hesitate to wax longiloquence simply to hear its own words resonate.").

The Cannings' complaint is premised on 11 U.S.C. § 524(a), which sets forth an automatic injunction against efforts intended to collect an already discharged debt. The injunction affords honest but unfortunate debtors with a "fresh start" from the burdens of personal liability for unsecured prepetition debts and thus advances the overarching purpose of the Bankruptcy Code. In re Pratt, 462 F.3d at 17-18; see also Marrama v. Citizens Bank

---

[6] As alluded to above, the relevant findings of fact are: (1) that the collateral at issue is real estate with an estimated value of $75,000, as of the time the adversary proceeding was initiated; (2) that the value of said collateral could change up as well as down; and (3) that Beneficial provided alternatives--that is, a settlement or a short sale--indicating that it sought to be paid no more than the value securing its lien.

-9-

of Mass., 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"(quoting Grogan v. Garner, 498 U.S. 279, 286 (1991))). For that reason, the scope of the injunction is broad, and bankruptcy courts may enforce it through 11 U.S.C. § 105, any sanctions imposed for violations being in the nature of civil contempt. In re Pratt, 462 F.3d at 17, 21.

Despite its broad scope, the discharge injunction does not enjoin a secured creditor from recovering on valid prepetition liens, which, unless modified or avoided, ride through bankruptcy unaffected and are enforceable in accordance with state law. Id. at 17. One of the ways through which debtors might free themselves from a prepetition lien is by surrendering the encumbered collateral to the secured creditor under 11 U.S.C. § 521(a)(2). Id. at 17-18. "Surrendering" in this context means "that the debtor agree[s] to make the collateral available to the secured creditor--viz., to cede his possessory rights in the collateral . . . ." Id. at 19. The secured creditor, however, has the prerogative to decide whether to accept or reject the surrendered collateral, since "nothing in subsection 521(a)(2) remotely suggests that the secured creditor is required to accept possession of the [collateral]." Id. But the creditor's decision in this respect must not constitute a subterfuge intended to coerce payment of a discharged debt. Id. at 19-20. Accordingly, when a debtor

-10-

satisfies his burden of showing that the creditor's reluctance is intended as a subterfuge to coerce such payment, a matter courts determine in the context of the particular facts, the discharge injunction applies with full force and effect. Id.; see also ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.), 450 F.3d 996, 1007 (9th Cir. 2006) (stating that the debtor bears the burden of proof in claims of discharge injunction violations).[7]

We set forth and applied the foregoing requirements in Pratt, hence the Cannings' steadfast reliance on that case. As previewed above, Pratt revolved around a secured creditor's refusal to either repossess or release a lien on an inoperable, worthless car that Chapter 7 debtors moved to surrender in bankruptcy. Finding the value of the car insufficient to satisfy foreclosure expenses, the secured creditor wrote off the balance of its loan, and left the debtors in possession of the encumbered collateral. Upon receiving their bankruptcy discharge, the debtors promptly sought to dispose of the car at a salvage dealer. But because under applicable state law a dealer could receive a junk car only if free from all liens, the debtors were unsuccessful in their

---

[7] In its brief in opposition, Beneficial raised the issue of whether the creditor's coercive intent must be proved under either the "preponderance of the evidence" or "clear and convincing evidence" standard. Because the Cannings complaint fails under either standard, we need not reach the issue here. All the same, the Cannings waived the issue by failing to raise it in their opening brief. Evans Cabinet Corp. v. Kitchen Int'l, Inc., 593 F.3d 135, 148 n.20 (1st Cir. 2010) ("Because this argument was not raised in its opening brief, it is waived.").

attempt to transfer possession of the car. And when the debtors asked the secured creditor to either repossess the car or release its lien, it repeatedly refused, informing the debtors that the lien would be released only upon full satisfaction of the unpaid loan amount.

After reopening their bankruptcy case, the debtors filed an adversary complaint, alleging that the secured creditor's posture was intended to coerce payment on a discharged debt, in violation of the discharge injunction. In reversing the bankruptcy court's judgment for the secured creditor, we zeroed in on the following facts: (1) the secured creditor refused to repossess the car, but conditioned release of its lien upon full payment of the loan balance; (2) the debtors could not dispose of the car while encumbered and thus would have to keep it indefinitely (together with the accompanying costs) unless they "paid in full"; and (3) there were no reasonable prospects that the car would generate sale proceeds for the secured creditor to attach, as it was essentially worthless with limited possibilities of appreciation over time.

Based on those facts, we held that the secured creditor's posture in exclusively conditioning release of its lien on full payment of the loan balance amounted to a reaffirmation of debt demand that contravened "the stringent 'anti-coercion' requirements of [the] Bankruptcy Code . . . ." In re Pratt, 462 F.3d at 20. Similarly, we noted that the secured creditor's refusal to release

its lien "had the practical effect of eliminating the [debtors'] 'surrender' option under § 521(a)(2)." Id.

But given the secured creditor's prerogative to insist on its state-law in rem rights, we did not stop our analysis there. Rather, we set out to determine whether the secured creditor had articulated any reasons to explain away its posture. Since the secured creditor only proffered its state-law rights as a defense, we analyzed the creditor's underlying conduct to see whether it could be legitimized as a valid pursuit of those rights. We found that it could not, underscoring both the minimal value of the collateral and the lack of reasonable prospects that the collateral would ever be converted to attachable sale proceeds. As we stated at the time: "the legitimate raison d'etre for the [secured creditor's] lien no longer obtained[;] the federal bankruptcy-law interest in according debtors a fresh start, free from objectively coercive reaffirmation demands, must be accorded supremacy." 462 F.3d at 20.[8]

---

[8]  The BAP appears to have interpreted the preceding language to mean that "a finding of significant value is sufficient to justify [a secured creditor's] refusal to discharge its mortgage." 462 B.R. at 267. Such an interpretation is at odds with Pratt's case-by-case, factually-specific inquiry; therefore, we disavow the same. The value of the underlying collateral is of course an important factor to consider when adjudicating controversies in these types of cases. Final adjudication, however, is a holistic process, where the conduct of the parties and their particular circumstances also play pivotal roles.

In this case, contrary to the Cannings' contentions, the factual scenario is much different than that in Pratt. Absent from this case is the exclusive "pay in full" conditional release presented in Pratt. Rather, in this case, Beneficial offered to release its lien through either a settlement offer or a short sale. This not only indicates the intent to collect no more than the value secured by the underlying lien, as the bankruptcy court observed, but also denotes a willingness to negotiate a palatable solution for all involved.

By like token, this case is missing the quandary the debtors in Pratt faced, where they were required to either yield to the secured creditor's "pay in full" demand or indefinitely remain in possession of inoperable, worthless and burdensome collateral. The BAP's opinion was right on point in this respect: "there is nothing in the record . . . to evidence any expenses related to [the Cannings' continued] equitable ownership other than the . . . reference in their brief to being exposed to liability." 462 B.R. at 267. And to that we add that the appellate record also lacks evidence to show that the Cannings' residence was "inoperable" or unlivable when it was abandoned.[9]

---

[9] The Cannings never argued, and nothing in the record shows, that they lacked the means to satisfy the incidental costs of owning a house--e.g., utilities, routine upkeep, liability insurance, etc. The Cannings did mention being unable to afford their monthly mortgage payments, but their bankruptcy discharge freed them from that obligation.

Furthermore, the record here does not paint a picture in which a secured creditor cornered the debtors between a rock and hard place. The record before us contains no evidence showing that the alternatives Beneficial proposed were unfeasible--that is, the Cannings never explained to the court exactly why a short sale or a settlement was out of the question for them. The record is also devoid of any other indicia of coercion, such as, for example, Beneficial's refusal to negotiate with the Cannings a compromise different to the one originally proposed. In fact, from the record available to us, it seems that the Cannings employed a "take it or leave it" approach in negotiating with their mortgage lender, who, given its state-law rights over the collateral, did not have to accept the two choices presented. Bankruptcy law, we must emphasize, cannot alter a secured creditor's state-law rights, unless it is shown that those rights are relied upon to coerce payment of a discharged debt. The record before us simply lacks that evidence.

Last but not least, unlike the collateral in <u>Pratt</u>, the collateral involved here is far from worthless, and its value may increase over time. A reasonable possibility that the collateral could be converted to attachable sale proceeds therefore exists, and, unlike <u>Pratt</u>'s secured creditor, Beneficial can point to its state-law rights as one of the factors supporting its posture.

-15-

The Cannings downplay the foregoing differences and instead invite us to focus on the fact that their residence plummeted in value to little more than 38% of its original market price. According to the Cannings, that fact invites the inference that "Beneficial decided not to foreclose on the property [because] it would not be cost effective." Such a business decision, the Cannings continue, "clearly put into question [their] fresh start, which is what the First Circuit in Pratt specifically prohibited a creditor from doing." There are several problems with the Cannings' contentions.

First, the record contains no evidence to support the inference the Cannings urge us to draw.[10] Second, their reading of Pratt is overly broad. Under the Cannings' reading, we would have to find a discharge injunction violation every time a secured creditor opposes a debtor's "foreclose or release" demand based on the business determination that repossession is not cost effective. But, on one hand, Pratt unequivocally held that the applicable inquiry revolves around the particular facts of each case, with the value of the underlying collateral being only one of several factors to be considered. On the other, Pratt sought to strike a

---

[10]  To support their inference, the Cannings refer us to evidence that is not part of the record on appeal, and "[i]t is elementary that evidence cannot be submitted for the first time on appeal." United States v. Rosario-Peralta, 175 F.3d 48, 56 (1st Cir. 1999). In any event, were we to draw the Cannings' proposed inference, our decision would remain unchanged for the reasons discussed below.

balance between the competing state-law rights of secured creditors and the bankruptcy rights of debtors, and the reading the Cannings advance improperly skews that balance against secured creditors.

Third, and perhaps most importantly, Pratt does not support the conception that the Cannings appear to have of the Bankruptcy Code's "fresh start." The debtors in Pratt sought to disentangle themselves from an unduly burdensome situation by following a legally feasible alternative, without improperly burdening others. The Cannings, in contrast, invoke the "fresh start" to indirectly validate the decision to abandon their residence. They do so without providing any evidence showing that the residence posed an undue burden upon them after their bankruptcy discharge. The Cannings also fail to advance any legal authority, and we are not aware of any, to support the proposition that a homeowner may walk away, with no strings attached, from their legally owned residence. But even worse, in vacating their residence, the Cannings placed many of the burdens of dealing with an abandoned property on their neighbors, their town, and their city -- in other words, on everyone but them. The "fresh start" does not countenance that result. Cf. In re Hermoyian, 435 B.R. 456, 466 (Bankr. E.D. Mich. 2010) ("A fresh start does not mean debtors are free from all of the consequence of every decision that they have made, which in hindsight, might have been ill-advised."). Nor does it generally "discharge the ongoing burdens of owning

property," as the bankruptcy court aptly noted.  See In re Canning, 442 B.R. at 172;  cf. River Place E. Hous. Corp. v. Rosenfeld (In re Rosenfeld), 23 F.3d 833, 837 (4th Cir. 1994) (finding an obligation to pay postpetition assessments nondischargable because it arose from the debtor's continuing ownership of property, not from a prepetition obligation).

A coda is necessary before we conclude.  Today, where both lenders and homeowners strive to recuperate from hard economic times, this opinion should not be relied upon to leverage a way out of the bargaining table.  It is one thing to insist upon state-law rights in refusing a recalcitrant "foreclose or release" demand by a debtor, and completely another to refuse negotiating with a debtor willing to compromise.  Put differently, while this case may provide some guidance on the dos and don'ts applicable to the bargaining dynamics between secured creditors and bankruptcy debtors, our remarks in Pratt still control: "the line between forceful negotiation and improper coercion is not always easy to delineate, and each case must therefore be assessed in the context of its particular facts."  462 F.3d at 19.

### III. Conclusion

For the reasons discussed above, we **affirm** the bankruptcy court's judgment, each party bearing their own costs.

**Affirmed**.